576 F.2d 983
 UNITED STATES of America
v.
564.54 ACRES OF LAND, MORE OR LESS, situated IN MONROE AND
PIKE COUNTIES, COMMONWEALTH OF PENNSYLVANIA, and Benedict F.
Pastorini, et al., Southeastern Pennsylvania Synod of
Lutheran Camp of America.
Appeal of SOUTHEASTERN PENNSYLVANIA SYNOD OF LUTHERAN CAMP OF AMERICA.
 No. 77-1238.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 21, 1977.
Decided March 27, 1978.
 
 H. Ober Hess, M. Carton Dittmann, Jr., Peter M. Mattoon, Henry W. Asbill, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellant.
 James W. Moorman, Acting Asst. Atty. Gen., Peter R. Taft, Edmund B. Clark, Attys., U. S. Dept. of Justice, Washington, D. C., Peter H. Ruvolo, Trial Atty., Dept. of Justice, Brooklyn, N. Y. and Peter R. Steenland, Jr., Atty., U. S. Dept. of Justice, Washington, D. C., for appellee.
 Before ROSENN and VAN DUSEN, Circuit Judges, and STERN, District Judge.*
 OPINION ANNOUNCING JUDGMENT OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 The principal issues in this appeal are whether the jury, charged with determining damages owed by the United States to the Southeastern Pennsylvania Synod of the Lutheran Church in America ("Synod") for land taken under the power of eminent domain, was properly instructed in the law and whether the jury was sufficiently misled by a remark made by counsel for the Government to require a new trial. We hold that the combination of inadequate instructions by the trial judge and a misstatement of law made by the Government during its closing argument require a new trial.
 
 I.
 
 2
 The trial in this case arose from a condemnation by the Government, as part of the Tocks Island Recreational Project, of three summer camps located on the Delaware River and owned and operated on a not-for-profit basis by the Synod. Prior to trial, the Synod sought a ruling that the proper measure of damages for just compensation under the Fifth Amendment is the cost of constructing substitute facilities to replace the camps, rather than the fair market value of the camps. Noting that the substitute facilities doctrine had only been applied in cases in which the condemnee was a governmental entity, the district court ruled that the substitute facilities doctrine was inapplicable. In an interlocutory appeal under 28 U.S.C. § 1292(b), this court reversed, holding that the substitute facilities measure of fair compensation is available to private owners of non-profit facilities if there is no ready market for the facilities and if the facilities are "reasonably necessary to public welfare." United States v. 564.54 Acres of Land, 506 F.2d 796, 800 (3d Cir. 1974). This court did not decide whether the property in this case met the test for the application of the substitute facilities doctrine, but left that issue for the determination of the district court.
 
 
 3
 Trial was divided into two phases. The first phase considered the issue of whether the substitute facilities doctrine applied to the condemned camps. Via a special interrogatory, the jury found that it did not apply. The second phase consisted of a damage determination using the fair market value test. The jury returned a verdict awarding $740,000. in damages. The Synod moved for a new trial on the phase one issue. Shortly thereafter, the trial judge died, and the judge to whom the case was reassigned denied the motion. This appeal followed.
 
 
 4
 The record establishes that the three pieces of property, acquired between 1927 and 1947, were treated as one for administrative purposes and that the camps were operated on a not-for-monetary-profit basis by the Eastern Pennsylvania Lutheran Camp Corporation, a Pennsylvania non-profit corporation. The camps lost money each year and were subsidized by gifts from members of the Lutheran Church. The camps provided activities such as water and land sports, nature appreciation activities, and arts and crafts. They were open to children without any restriction as to race or religion. Scholarships to the camps were given to underprivileged and emotionally disturbed children. Campers included children from inner-city Philadelphia, some of whom were provided an opportunity to go to camp as a means of alleviating the "gang" problems in the inner-city. A number of charitable organizations paid the tuition of children who could not otherwise go to camp. These children included Protestants, Catholics, Jews, and children expressing no religious affiliation. These organizations could not afford to send children to camps operated for a profit. Additionally, many campers were not economically deprived and did not receive financial assistance.
 
 
 5
 Evidence was introduced by the Synod to show that during the period when the Synod knew that the camps were going to be condemned, no camp was on the market, nor was any combination of camps simultaneously on the market which would have adequately replaced the condemned camps. Consequently, the Synod felt the only way to continue the camping operation was to purchase land and construct new camping facilities. The Synod's expert witness testified that a conservative estimate was that it would cost approximately $4,361,000. to replace the camps by constructing new facilities. Apparently, the reason for the great disparity between this figure and the $740,000. fair market value of the camps is attributable to the fact that the condemned camps were allowed to operate in noncompliance with state and federal housing and environmental legislation under grandfather clauses, but a newly constructed camp would require elaborate facilities to comply with this legislation. 564.54 Acres I at 798.
 
 
 6
 Although the Government did not acquire the camps until 1970, the publicity regarding the Tocks Island Recreational Area caused the Synod to anticipate the condemnation, and in 1964 the Synod purchased land in the Poconos for construction of a replacement camp.
 
 II.
 
 7
 At the conclusion of phase one of the trial, the court submitted to the jury, together with a lengthy charge, the following interrogatory: "Under the principles I have given you, does the doctrine of substitute facilities apply?" The crucial issue in this appeal, as we see it, is whether this interrogatory was submitted to the jury in a confusing and misleading manner in light of the charge to the jury and remarks made by counsel for the Government in summation.
 
 
 8
 The Synod specifically argues that the court should not have submitted an omnibus question to the jury, but rather should have submitted each of the elements of the substitute facilities doctrine to the jury in a separate question. Our discussion of these elements infra shows that, due to their complexity, this position has great merit, and, in light of our discussion of the elements, the district court may wish to adopt this approach on remand. However, we decline to consider this specific contention, which is part of the larger question of whether the special interrogatory was confusing or misleading, as a ground for reversal. The Synod did not object to the form of the interrogatory at trial, although given ample opportunity to do so, and where a party does not object to the wording of a written interrogatory at trial we will not review it on appeal. Frankel v. Burke's Excavating, Inc., 397 F.2d 167, 170 (3d Cir. 1968). See also Kirkendoll v. Neustrom, 379 F.2d 694, 698 (10th Cir. 1967); Wyoming Construction Co. v. Western Casualty and Surety Co., 275 F.2d 97, 104 (10th Cir.), cert. denied, 362 U.S. 976, 80 S.Ct. 1061, 4 L.Ed.2d 1011 (1960).[1]
 
 
 9
 A determination of whether the jury was confused or misled in answering the interrogatory requires us to examine in detail the principles established by 564.54 Acres I and its progeny and determine whether the charge given to the jury and the alleged prejudicial misstatement of law made by the Government comport with those principles. This will require us to review the jury instructions, to which the Synod did not object in the district court. Although generally jury instructions will not be reviewed on appeal if they were not objected to at trial,[2] we have the discretion to review instructions sua sponte if the error is fundamental and highly prejudicial or if the instructions are such that the jury is without adequate guidance on a fundamental question and our failure to consider the error would result in a miscarriage of justice.[3] Though this discretionary power should be exercised sparingly, Trent v. Atlantic City Electric Co., 334 F.2d 847, 859 (3d Cir. 1964); Mazer v. Lipschutz, 327 F.2d 42, 52 (3d Cir. 1964), we think it is exercised appropriately in this case. As the following discussion demonstrates, "(t)he jury was without adequate guidance on (a) fundamental question . . . ." Wilson v. American Chain and Cable Co., 364 F.2d 558, 562 (3d Cir. 1966). Failure to rectify this error could result in a miscarriage of justice because it could mean that the Synod would receive several million dollars less in compensation than that to which it is entitled. We turn now to an examination of the principles of 564.54 Acres I, the charge, and the remarks made in the Government's closing argument.
 
 III.
 
 10
 In 564.54 Acres I we held that the substitute facilities doctrine applied to privately owned property if three conditions were met: (1) the property must be operated on a not-for-profit basis; (2) there must be no ready market for the particular type of property; and (3) the property, or facilities, must be "reasonably necessary to the public welfare." Id. at 796. Each of these conditions has complexities and we will analyze each of them in turn.
 
 A. NOT-FOR-PROFIT BASIS
 
 11
 The dispute at the trial over this element of the substitute facilities test concerned whether "not-for-profit" refers to monetary profit or to any type of profit. Specifically, the dispute is whether operating facilities for "spiritual profit" precludes application of the substitute facilities doctrine.
 
 
 12
 During closing argument, counsel for the Government made the following statements:
 
 
 13
 "On the question of not-for-profit, we concede they are a religious and charitable organization which was operating on a not-for-monetary profit. No question about it. But, is that the only kind of profit? Think about it. They were putting in operation a camping program which was for the betterment of their religious teachings. Is that not a profit for a religion? (The Synod's counsel) said, 'And if by chance some kid might be converted. . . . Isn't that what they are there for? Isn't that their mission?' So, maybe they were operating not for a monetary profit but maybe for a spiritual profit. (140a)
 
 
 14
 "He (Pastor Gulliford) said he visited Camp William Penn. I don't know if you recall that. It was just a short part of his testimony. He said that's a city-run camp. He said it handled roughly the same number of children. But he said the difference was, and here's your tip-off why this is not to be considered as a not-for-profit operation; he said, 'They had different goals.' Sure they did. They were there to take care of the children from the ghetto areas, period. They weren't there to promote their religion or any religious teachings, or doctrine." (144a-45a)
 
 
 15
 The Synod argues that this is a misstatement of the law, and that these statements misled the jury as to the proper test for application of the substitute facilities measure. Of course, a misstatement of law which is prejudicial and not cured can be grounds for a mistrial. See Hockaday v. Red Line, Inc., 85 U.S.App.D.C. 1, 3, 174 F.2d 154, 156 (1949). The Government, however, makes three arguments in response. It argues, first, that this is not a misstatement of law; second, that even if it were, it was cured by the judge; and, third, that the Synod is precluded from raising this issue because it failed to make a timely objection. We reject all three of these arguments.
 
 
 16
 First, it is clear that the court in 564.54 Acres I was referring to monetary profit. In the context of a discussion of the camps' not-for-profit operation, the court noted that the Synod claimed that the camps were operated at a loss. Surely this means that the camps operated at a monetary loss, not a spiritual loss, and therefore the court also must have been referring to monetary, not spiritual, profits. Moreover, the court noted that if property has no marketplace, the substitute facilities measure is applicable to non-profit facilities and the present value of capitalized future earnings measure is applicable to profit-making facilities. Id. at 799. Because spiritual earnings cannot be capitalized, "profit" in the context of this discussion means monetary profit. This is the only reasonable interpretation of "not-for-profit," for to hold that a private owner cannot qualify for application of the substitute facilities doctrine if he receives any type of profit, no matter how intangible or ephemeral, from his property would render the doctrine inapplicable to private owners in every instance. Every charitable organization receives some type of profit from its public works in the form of the feeling of achievement and satisfaction the contributors derive from their good work or the enhancement of the image of the organization and its members in the eyes of the community.[4]
 
 
 17
 We conclude that the remarks by counsel for the Government constituted a clear misstatement of law.
 
 
 18
 Aside from being a misstatement of law, one of these remarks was improper for a second reason. The second statement quoted above clearly implies that the purpose of the camps was to promote the Lutheran religion, teachings and doctrine. This may have influenced the jurors to find that the substitute facilities measure did not apply because they did not want the taxpayers' funds to be used to convert campers to the Lutheran religion. There is absolutely no evidence in the record to indicate that the Synod used the camps to proselytize. Therefore, this remark was highly inaccurate, as well as prejudicial.
 
 
 19
 We do not think the trial judge cured this misstatement of law and the resulting prejudice. Counsel for the Synod objected to these remarks and the court overruled the objection without comment (N.T. 784), apparently thinking either that this was not a misstatement of law or that it was not sufficiently prejudicial to require curative instructions. In the charge, the trial judge did tell the jury "to follow the law as stated in the instructions of the Court" (N.T. 788) and that "statements of counsel are not evidence" (N.T. 795). The court, however, never told the jury that the statements of counsel are not law, never told the jury to disregard statements of law by counsel, and never singled out the offending remarks as being erroneous. Because of the inaccurate and highly prejudicial nature of these remarks, we do not think these general instructions cured the damage. Moreover, the only times the charge referred to the non-profit element of the substitute facilities test the court did not specify not-for-monetary-profit (N.T. 798, 802). It would have been an easy matter for the district court to expressly state that the Government's remark was a misstatement of law. The general remarks the dissent finds to be curative fall far short of the type of explicit statement that would have eliminated any possibility of prejudice. The fact that the district court overruled the Synod's objection to this remark (N.T. 784) indicates that the court did not intend to cure the effect of this error.
 
 
 20
 We think the objection to the improper remarks was timely. The Synod did not object to the remarks at the time they were made nor attempt to rebut them in its closing argument. Rather, counsel objected in chambers after the trial had recessed for the day. Relying on two cases from other circuit courts of appeals, Sanden v. Mayo Clinic, 495 F.2d 221 (8th Cir. 1974), and Hyman v. Life Insurance Company of North America, 481 F.2d 441 (5th Cir. 1973), which held that objection is waived if counsel does not either object or move for a mistrial at the time remarks are made, the district court held that the Synod had waived objection. Although the better practice is to object at the time the remarks are made, the rule of Sanden and Hyman has not been adopted in this circuit. Rather, the rule in this circuit is that, to be reviewable, an error must be called to the attention of the trial court so that the trial court has an opportunity to rule on the matter and correct any prejudicial errors. Shepler v. Crucible Fuel Co., 140 F.2d 371 (3d Cir. 1944). On this standard, the objection was timely, since the trial judge could have corrected any impropriety in supplemental instructions to the jury the next morning.
 
 
 21
 We note finally that the evidence established that the camps were run on a not-for-monetary-profit basis and that the Government conceded this. Accordingly, the jury could not have properly found that this element of the substitute facilities test was not met, and the court should have ruled that it was met as a matter of law.
 
 B. NO READY MARKET
 
 22
 The jury instructions on the no ready market condition were substantially correct at times and somewhat confusing at one point. Taken alone, therefore, the instructions on this point would not be grounds for reversal. However, since the parties disagree on the meaning of the no ready market condition, and since a clarification of the meaning of that condition by this court will enable the district court on remand to instruct the jury more clearly and succinctly, a discussion of this point is necessary. Although there was no fundamental error in the instructions on this point, any departure from a clear, succinct statement would tend to blur the confusing task the jury faced in answering a complex, multifaceted question.
 
 
 23
 The Synod interprets the condition that there be no ready market to mean that the facility must be unique in the sense that it cannot be replaced in the marketplace at a cost roughly equivalent to its fair market value. The Government interprets the condition to mean that no market value can be established because the facility cannot be sold in the marketplace. Of course, if there is no market, the facilities can be neither bought nor sold. When the substitute facilities doctrine was first developed, it was in the context of facilities such as highways, which have no market value in this economic sense, see, e. g., Fort Worth v. United States, 188 F.2d 217 (5th Cir. 1951); United States v. Los Angeles County, 163 F.2d 124 (9th Cir. 1947). Highways are never bought or sold on the market. However, when the Court of Appeals for the Second Circuit applied the substitute facilities doctrine to such facilities as a gymnasium, United States v. Certain Property, 403 F.2d 800 (2d Cir. 1968), and we applied the doctrine to camps, it became clear that the concept of a ready market took on a different meaning because camps and gymnasia are bought and sold privately and have market values.
 
 
 24
 It is important to distinguish between the market for the underlying property adaptable to various uses and the market for the existing facilities. Although a camp owner can readily sell camp property either for use as a camp or because he can obtain a market price determined by alternative uses of the property, a displaced camp owner may not be able to purchase a comparable existing facility because, in a given area, there may be a limited number of camps whose facilities may vary substantially. Thus, a camp at certain times and under certain economic conditions may be sufficiently unique to be irreplaceable in the market,[5] requiring the displaced camp owner to purchase property and construct facilities equivalent to those taken. Cf. Newton Girl Scout Council v. Massachusetts Turnpike Authority, 335 Mass. 189, 197-198, 138 N.E.2d 769, 775 (1956). If this is so, the "no ready market" condition is met.
 
 
 25
 In 564.54 Acres I, at 799-800, the court stated:
 
 
 26
 "The basic principle underlying the constitutional requirement of 'just compensation' is one of indemnity. The condemnee 'is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but he is entitled to no more.' Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934).
 
 
 27
 "If the government condemns property for which there is a ready market (commodities are a classic example) payment of the fair market value is complete indemnity since, whatever its intended use, the condemnee can readily replace it in the marketplace.
 
 
 28
 " . . . Indeed, the Second Circuit in United States v. Certain Property, 403 F.2d 800, 803 (2d Cir. 1968), and the Ninth Circuit in California v. United States, 395 F.2d 261, 266 (9th Cir. 1968) have made it clear that even in those comparatively rare instances where there is a market value for the community facility taken (for example a possible sale of a public building for private use) the government's duty to indemnify is to provide the cost of a more expensive public substitute facility. . . . Simply stated this method insures that sufficient damages will be awarded to finance a replacement for the condemned facility."
 
 
 29
 (Footnote omitted, emphasis supplied.)
 
 
 30
 This language makes clear that regardless of whether the Synod could have sold the camps, and regardless of whether the camps had fair market value, this condition of the substitute facilities doctrine is met if the Synod could not have replaced the camps' facilities in the marketplace for a cost roughly equivalent to the fair market value of the camps.[6] Therefore, a facility will be deemed replaceable in the marketplace if the owner, exercising reasonable diligence,[7] could have purchased a functionally equivalent replacement at a cost roughly equal to the fair market value of the taken facility[8] during a reasonable time after notice of condemnation.[9]
 
 
 31
 C. "REASONABLY NECESSARY"
 
 
 32
 To qualify for the substitute facilities measure the facility must be "reasonably necessary to public welfare." 564.54 Acres I at 796. "Reasonable necessity" is an elusive concept, and consequently this is a difficult element of the substitute facilities doctrine to apply. The Government interprets "reasonable necessity" to mean that the facility must be necessary to the community in a strict sense, in the sense that it is indispensable and the community cannot get along without it. Brief for appellee at 12, 25. The Synod, on the other hand, equates "reasonable necessity" with community benefit. Brief for appellant at 32. We think the Synod's interpretation comes closer to capturing the correct meaning of "reasonably necessary."
 
 
 33
 In some early cases, courts required that for replacement facilities to be necessary, the governmental owner must be compelled by law to replace them. E. g. United States v. Board of Education of County of Mineral, 253 F.2d 760, 764 (4th Cir. 1958); Clarksville v. United States, 198 F.2d 238, 243 (4th Cir. 1952); United States v. Wheeler Tp., 66 F.2d 977, 984 (8th Cir. 1933). The court in 564.54 Acres I expressly rejected the legal necessity test. Most courts have adopted a "factual necessity" test holding that, in some sense, the facilities must be necessary in fact. E. g. United States v. 3,727.91 Acres of Land, 563 F.2d 357 at 359 n.2 (8th Cir. 1977); United States v. Streets, Alleys & Public Ways, Etc., 531 F.2d 882, 886 (8th Cir. 1976); United States v. Certain Property in Borough of Manhattan, supra at 803-04; United States v. Certain Land in Borough of Brooklyn, supra at 695; Washington v. United States, 214 F.2d 33, 40 (9th Cir. 1954); Fort Worth v. United States, 188 F.2d 217, 222 (5th Cir. 1951); California v. United States, 169 F.2d 914, 924 (9th Cir. 1948); United States v. Arkansas, 164 F.2d 943, 945 (8th Cir. 1947); United States v. Los Angeles County, 163 F.2d 124, 125 (9th Cir. 1947); United States v. Des Moines County, 148 F.2d 448, 449 (8th Cir. 1945). An examination of the facts of many of those cases which reject the application of the substitute facilities doctrine on the ground that substitute facilities are not factually necessary shows that "factually necessary" may not mean necessity in a strict or absolute sense. In a number of those cases, constructing substitute facilities would have provided virtually no benefit, which was deprived by condemnation, to the community, either because the condemned facility was unused prior to condemnation,[10] or because the condemnation eliminated any need for the facility,[11] or because the condemnor constructed a functionally equivalent facility to serve the purpose the condemned facility had been serving.[12] Therefore, interpreting "necessary" to mean "beneficial" is consistent with the results of these cases. Furthermore, at least one early circuit court of appeals decision adhering to the factual necessity test expressly rejected a strict interpretation of "necessity." Fort Worth v. United States, supra at 222.[13] We also note that commentators have supported rejection of a strict interpretation of necessity. Note, Duke L.J., supra note 4; Note, Substitute Facility Measure of Just Compensation Is Available to Private Owners of Nonprofit Community Facilities in Appropriate Cases, 6 Seton Hall L.Rev. 711 (1975); Note, Just Compensation and the Public Condemnee, 75 Yale L.J. 1053 (1966).
 
 
 34
 Although it is not clear that there ever was a generally accepted rule that substitute facilities must be strictly or absolutely necessary, if there were such a rule, 564.54 Acres I and other cases have abandoned that rule by qualifying "necessary" with "reasonably." Certain Property in Borough of Manhattan, supra; Certain Land in Borough of Brooklyn, supra. See 3,727.91 Acres of Land, supra; Streets, Alleys & Public Ways, Etc., supra; Washington v. United States, supra. Moreover, in holding that the substitute facilities measure can apply to such facilities as camps, playgrounds and gymnasia, these courts established that "reasonably necessary" cannot possibly mean "absolutely necessary" or "indispensable" because no one camp, playground or gymnasium could ever be absolutely necessary or indispensable to a community. Therefore, a court that held that the substitute facilities doctrine is applicable to this type of facility, but only if the facility is absolutely necessary, would be giving with one hand and taking away with the other. Additionally, the entire expression used by the court in 564.54 Acres I, "reasonably necessary to public welfare," also includes the elusive concept of public welfare. This suggests that the facilities need not be "reasonably necessary" to the existence of the community, but only to the well-being of the members of the community. They need not be so essential that they are required to make the community meet minimal standards, rather they need only make the community a better community. Read against the background of the history and development of the "necessity" requirement, the facts of the cases applying both the "factually necessary" test and the "reasonably necessary" test, and the ordinary language meaning of the expression "reasonably necessary to public welfare",[14] the meaning of this element of the substitute facilities doctrine becomes clearer. There are two aspects to "reasonable necessity." First, for a facility to be "reasonably necessary" it must provide a benefit to the community or be rationally related to the public welfare.[15] Of course, to say that a facility provides a benefit to the community is not to say that it serves everyone in the community. For example, a small neighborhood park that serves only the people living within walking distance from it may provide a benefit to the community. In this case, the Synod attempted to show that the camps helped alleviate the "gang" problem in inner-city Philadelphia. If the camps did help reduce such juvenile crime, then they provide a benefit to the entire community of Eastern Pennsylvania, not just to the campers.
 
 
 35
 Secondly, for a facility to meet the "reasonably necessary" test, the condemnor must not have eliminated the need or purpose which the condemned facility served. For example, if the condemnor has provided a functionally equivalent replacement facility, or if the condemnor renders a replacement facility useless by flooding the town it would have served, the condemnor has eliminated the need or purpose the condemned facility served, and it is not "reasonably necessary" to replace it. To summarize, for a facility to be "reasonably necessary to public welfare," it must provide a benefit to the community that will not be as fully provided after the facility is taken.
 
 
 36
 Again, the jury instruction on this point did not accurately reflect our interpretation of the law. Although at one point the instruction regarding "reasonable necessity" referred to "fulfilling a community need or purpose" (N.T. 798), the instructions never equated "reasonably necessary" with community benefit. More seriously, the instructions seem to have emphasized the strict sense of necessity which we have rejected here. For example, they stated that for the "reasonably necessary" test to be met, the Synod must have a duty to replace the facility and the duty need not be legally compelled but may arise from necessity (N.T. 801). Moreover, the words "need" and "necessary" were used throughout the charge, but "benefit" was never used.[16] Therefore, the charge on the "reasonably necessary" issue was confusing and misleading.IV.
 
 
 37
 In part III above we established that three conditions must be met for the substitute facilities measure to apply to privately owned property. With the caveat that a summary cannot articulate the complexities discussed above, we summarize the three conditions as follows: (1) the condemned facility must have been operated on a not-for-monetary-profit basis; (2) the owner, exercising reasonable diligence, must have been unable to purchase a functionally equivalent replacement at a cost roughly equal to the fair market value of the taken facility; (3) the facility must have provided a benefit to the community that will not be as fully provided after the facility is taken.[17] Therefore, on remand for a new trial, whether these three conditions are met must be determined.
 
 
 38
 The order of the district court denying the Synod's motion for a new trial will be reversed and the case remanded for a new trial in accordance with this opinion.
 
 
 39
 STERN, District Judge (concurring).
 
 
 40
 There is much in Judge Rosenn's dissent with which I agree, but I am compelled to vote for reversal because we are bound by 564.54 Acres I. I fully concur in the implication in Judge Rosenn's dissent that the standards announced in this Court's interlocutory opinion were impossible for the district court to apply, and I am filled with admiration for the late, distinguished trial judge who handled this matter. If the question before this Court were whether the district judge did a good job or a bad one, I would vote for affirmance. Judge Sheridan did the very best he could given the inherent difficulties of this case and the ambiguous directions he was given in this Court's interlocutory opinion. But the trial judge is not a party to the lawsuit and the object of an appeal is not to vindicate him, but to insure that the rights of the litigating parties have been fairly adjudicated. Thus, while I reach a different conclusion than does Judge Rosenn, my reasons for doing so are largely in accord with his view that it was impossible for the trial judge and jury to apply the vague standards forced on them by the interlocutory opinion.
 
 
 41
 It is regrettable that the parties will have to return to the district court a third time, but no other result is possible under the rules of the United States Court of Appeals for the Third Circuit. Only one member of this panel has authority to vote for rehearing en banc and without such a rehearing, 564.54 Acres I is the rule of the Circuit. Under the rule of the case, neither the government nor the Synod received a fair trial, and it is difficult to see how they could have received one.
 
 
 42
 As Judge Rosenn points out, the definitions of the elements required to establish entitlement to compensation measured by the cost of substitute facilities are so blurry that no one knows what they are. I also think that Judge Van Dusen has done a masterful job of cleaning up the debris.
 
 
 43
 I agree with Judge Van Dusen that the instructions given to the jury were confusing, contradictory, and, in some measure, erroneous. I have no doubt that there was a faithful attempt to apply the standards set down in the interlocutory opinion, but those standards were themselves confusing and contradictory where they existed at all. And I believe that the errors that were committed were so fundamental that the litigants' failure to object will not bar review.
 
 
 44
 The 564.54 Acres I opinion states variously that the cost of substitute facilities may be the measure of compensation (1) where there exists no ready market; (2) where the condemned facilities have no market value; (3) where, although there is a market value, it is not commensurate with the government's obligation to indemnify; and (4) where the facilities are single purpose and/or unique. It is evident upon reading the trial court's instructions to the jury that the melding of these distinct concepts leads to nothing but confusion.
 
 
 45
 No greater clarity exists with respect to the requirement that the condemned facility, or, more precisely, a replacement for the condemned facility be "reasonably necessary." To my mind, it is not at all clear that the interlocutory opinion even addressed this issue. The interlocutory opinion begins with broad reference to facilities operated "for a religious or charitable purpose." It uses, on numerous occasions, the language "community use". At only one point does it arguably narrow the application of the doctrine it espouses by approval of the approach of the Second Circuit "which recognizes that the decision to replace a facility may involve discretionary determinations as to community need, and that fair compensation for a structure reasonably necessary to public welfare means 'compensation . . . measured not in terms of "value" but by the loss to the community occasioned by the condemnation.' " This section of the opinion serves to refute the government's position on the interlocutory appeal that only a governmental entity under a legal obligation to replace the condemned facility should be entitled to the substitute facilities measure of just compensation. The interlocutory opinion thus rejects the legal necessity test but I do not think that it goes so far as to adopt the Second Circuit's theory of "reasonable necessity". That question is thus open for this Court to decide.
 
 
 46
 I believe that the views expressed by Judge Van Dusen are more consistent with the flavor, although not compelled by the holding, of the interlocutory appeal. Judge Rosenn's approach would make the doctrine virtually unavailable to the private condemnee who would rarely, if ever, be able to prove that its facilities were "factually" necessary or "reasonably necessary" in a strict sense. In fact, Judge Rosenn seems to go even further. He suggests that the appropriate test is that set forth in United States v. Streets, Alleys & Public Ways, 531 F.2d 882, 886 (8th Cir. 1976): that there be a legal or factual obligation to provide the facilities. This test resurrects the doctrine expressly rejected by the interlocutory opinion; no private condemnee is under a factual obligation (whatever that means) to provide its facilities any more than it is under a legal obligation to do so.
 
 
 47
 Further, I do not agree with Judge Rosenn that the charge to the jury on this aspect of the case was favorable to the Synod. In my view, the charge was prejudicial to the Synod, and it was fundamentally in error. The interlocutory opinion rejects the duty analysis and plainly holds that a condemnee may be entitled to the cost of substitute facilities where those facilities exist by virtue of "discretionary determinations as to community need." 564.54 Acres I, at 800. This quoted language is directly at odds with any concept of duty, regardless of how broadly the source of such duty may be defined. Yet the charge to the jury focused on the condemnee's duty to replace the condemned facility. See text of charge quoted in Judge Van Dusen's opinion, supra, at 995, n.16, and in Judge Rosenn's dissent, infra, at 1007, n.11. It directed the jury to find against the Synod if it found that it was under no duty to replace the camps.
 
 
 48
 Judge Van Dusen's view that a private, non-profit condemnee may be entitled to the cost of substitute facilities if such facilities serve to "make the community a better community" is consistent with the interlocutory opinion. It is the only test that will in any real degree make this measure of compensation available to the private, non-profit owner. However, I think that application of this standard illuminates the basic flaw in the interlocutory appeal's holding that private, non-profit owners are entitled to the cost of substitute facilities measure of compensation.
 
 
 49
 The rationale of the interlocutory ruling is as follows. The Fifth Amendment taking clause imposes an obligation upon the federal government not to take "private property" without just compensation. The public property of the state or its subdivisions is "private property" under the Fifth Amendment insofar as the federal obligation to make compensation is concerned. Jefferson County v. TVA, 146 F.2d 564 (6th Cir.), cert. denied, 324 U.S. 891, 65 S.Ct. 1024, 89 L.Ed. 1438 (1945); Town of Bedford v. United States, 23 F.2d 453 (1st Cir. 1927); Town of Nahant v. United States, 136 F. 273 (1st Cir. 1905). It has been held that just compensation upon condemnation of a community facility owned by a governmental entity may, in appropriate cases, be the cost of constructing substitute facilities. To disallow this measure of compensation to a private owner would distinguish irrationally between public and private owners of community facilities. Moreover, it would encourage the government to make discriminatory decision as to which property it will condemn, and could, thus, under certain circumstances, raise serious First Amendment problems.
 
 
 50
 If I were writing on a clean slate, I am not certain that I would hold that a governmental entity is entitled to the cost of substitute facilities as a measure of just compensation, at least where the condemning authority imposes no legal obligation on the condemnee to replace the condemned facilities. But even accepting that the cost of substitute facilities may be appropriate where the condemnee is a governmental unit,[1] to distinguish between a governmental owner and a private, non-profit owner seems to me no more invidious than the discrimination which results when the doctrine is applied to a private, non-profit owner but not applied, for instance, to a private individual whose property is not held for resale and who, because of any number of reasons, will not be able to replace the condemned property on the market for a price equivalent to its fair market value.
 
 
 51
 The distinction between the private owner who holds property for his own use and the private owner who devotes his property to a community purpose might be said to lie in the fact that condemnation of the former's property, even if the owner cannot replace it, injures only the private property owner whereas condemnation of the latter injures a larger community. But such a distinction is not valid. A privately owned factory enriches the community by providing jobs for its residents and monies for its tax coffers. A privately owned home benefits the community by sheltering some of its residents. A community may well be a better place in which to live if its residents have jobs, or shelter, just as it may be a better place to live if there are museums or summer camps open to its children or legitimate theatres run for profit. But attempts to compensate anyone but the property owner for loss lead to questions of value which are impossible to resolve.
 
 
 52
 Moreover, attempts to compensate the larger community through a condemnation award to a private entity are fraught with dangers. Putting aside, for the moment, the First Amendment's strictures, the courts are simply in no position to insure that the compensation award will continue to be devoted to serving a community purpose or the particular community purpose which the jury has found makes the community a better place in which to live. It is not simply a question of insuring that the condemnee does not divert the funds; community needs and desires may change and may render the facility wholly superfluous. In that event, even if it were possible, it would serve no purpose to require that the condemnee continue to operate the facility and if it ceases operation the condemnee may well reap a windfall.
 
 
 53
 In fact, with or without misuse by the condemnee of the award or a change of circumstances as described above, a windfall necessarily occurs upon application of the doctrine of the cost of substitute facilities. Under the rule of 564.54 Acres I, the condemnor is required to pay enough so that the condemnee can replace ancient, even dilapidated, facilities with brand new ones. The finder of fact is not permitted to consider the benefit which accrues to the condemnee when new facilities replace those with expired useful lives. No deduction can be made for depreciation.[2]
 
 
 54
 Where church-owned property is involved, constitutional obstacles present themselves no matter which narrow path we choose to follow. Attempts to supervise the use of the condemnation award will run afoul of the First Amendment's entanglement proscription. Thus, there is no way to insure that an award premised on use for substitute facilities will not be pocketed. Yet, in addition to offending our sense of fairness, any system of compensation which results in a windfall to the property owner may well violate the constitutional command that the government not aid religion.
 
 
 55
 But more fundamentally, when the condemned facility belongs to a religious organization, it is the inquiry which is as the very heart of the determination that the condemnee is entitled to the cost of substitute facilities which is obnoxious under our constitutional framework. The judge or jury has no right to pass on the "benefit" or the "necessity" to the community of such installations.
 
 
 56
 Both Judge Rosenn and Judge Van Dusen apparently agree on the impropriety of the government's comments in summation with respect to possible spiritual profit which accrued to the Synod through operation of its summer camps. I fully agree. They were improper, first, because they may have caused the jury to conclude that the Synod was not entitled to more than fair market value because it had failed to satisfy the not-for-profit aspect of the test. More important, however, they were improper because they must have caused the jury to speculate on the desirability of Lutheran-run summer camps.
 
 
 57
 Judge Rosenn notes, at 1008, n.12, that the government now contends it could argue to the jury that a Lutheran camp was not providing a "public benefit" because it was operated solely for the benefit of the Lutheran church. Judge Rosenn suggests that this "line of argument is permissible". I do not think it permissible. It is grotesque to find the United States Government making such an argument. Yet I am forced to recognize that this argument is justified even compelled by 564.54 Acres I which requires the court to determine and the government to litigate the reasonable community necessity of the thing condemned.
 
 
 58
 It is true, as Judge Van Dusen notes, that there is no direct evidence in the record to indicate that the Synod used the camps to proselytize. But there was evidence presented to the jury that the camps were run by a church organization as part of the church's religious mission, and in accord with its Articles of Incorporation which provide that "the purpose of the corporation is to promote the Christian religion according to the tenets of faith as set forth in the Laws of the Lutheran Church of America." There was evidence that each of the three condemned campsites included a chapel and that cabin devotions were part of the camp day and that religion classes were part of the camping program. The camps were run by Lutheran clergymen. Although Lutheran and non-Lutheran children were welcome, Lutheran children were given a slight price advantage. With this evidence before it, it is difficult to see how a juror would decide the question of desirability without reference to his own religious predilections and prejudices. And the government's argument was a direct appeal to those religious preferences. This is not an appropriate area of inquiry for a jury or for a judge, but it is unavoidable once the substitute facilities doctrine is made applicable to owners of church property. I do not believe that we can shut our eyes to these problems. It is just a matter of time until we see the case to which the panel on the interlocutory appeal refers in its hypothetical: condemnation of the ancient church edifice itself. The court will then be forced to address the issues I now perceive to arise in the instant case.
 
 
 59
 In sum, I have grave reservations regarding the cost of substitute facilities doctrine generally. I do not believe it should apply even to a governmental unit, unless the condemnor itself requires the condemnee to replace the facility which it has taken. Where the doctrine does apply, however, I would require the government to pay only the cost of a new substitute facility, less the depreciated life value of the facility condemned. Further, if the doctrine does apply, the existence of a market for the condemned facility is irrelevant.
 
 
 60
 I further believe that the cost of substitute facilities measure should not be extended to the private sector, but, if it is, I am convinced it must be applied to all private condemnees for whom the cost of replacement less depreciation is more than what the government offers. The use of the "reasonably necessary" test to discriminate among private condemnees is, for me, impermissible.
 
 
 61
 However, because I am bound by the holding in 564.54 Acres I, and because under the holding of that case as elucidated by Judge Van Dusen, I do not believe the litigants got a fair trial, I join Judge Van Dusen in Parts I, II and III of his opinion and I vote to reverse.
 
 
 62
 ROSENN, Circuit Judge, dissenting.
 
 
 63
 This was a long, complicated, and carefully tried case in which we have already had one interlocutory appeal. We now face a second appeal after a trial to a jury and verdict for the condemnee. If Judges Van Dusen and Stern have their way, I believe we will needlessly have another trial and probably a third appeal.
 
 
 64
 I respectfully dissent to the remand of this case for another trial because I believe first, that the jury charge given by the presiding judge, the late Chief Judge Sheridan, faithfully adhered to the principles of law enunciated by us in United States v. 564.54 Acres of Land I, 506 F.2d 796 (3d Cir. 1974), concerning condemnation of public facilities owned by a private nonprofit property owner, and that no party objected to the instructions; second, that the errors, if any, in the charge were minimal and nowhere near the magnitude of fundamental error; and third, that any possible misstatement of the law by the Government in its closing remarks was specifically cured by the trial judge.
 
 
 65
 Judge Van Dusen's opinion finds fault with the trial judge for his failure to give an adequate charge to the jury and for his failure to censure the Government for its closing remarks. Before assessing the district court's action, I believe some additional information pertaining to the Synod's campsites would provide perspective on the difficulties in applying the mandate in our decision in 564.54 Acres of Land I, supra.
 
 
 66
 The condemned camps, located on land formerly used for farming purposes, were situated a few miles north of Shawnee on the Delaware in Monroe County, Pennsylvania. There were over 800 camps in the Commonwealth of Pennsylvania at the time of the taking, 45 of which were located in Monroe County alone. In developing the Synod's campsites, various facilities were constructed, the last of which were cabins built in 1955. These facilities and the camps' programs were described by one expert witness at trial as not as good as some of the camps in the area and superior to others "generally speaking, they were average to above average."
 
 
 67
 These camps were typical of many other camps for children in the area, having similar activity programs and recreational facilities. The Synod's camps may have differed from the others in goals, philosophies, and, in some instances, religious training. Overall, however, one could reasonably have concluded that the condemned camps provided no special service to the community and that they were in pertinent ways like other camps such as Camp Wyomissing, located immediately to the south of the Synod's camps, operated as a nonprofit facility by the Big Brothers Association, and Camp William Penn, located some ten to twelve miles away, operated by the City of Philadelphia.
 
 
 68
 There was evidence in the record that the highest and best use of the condemned property was for camping purposes, although even when used as a camp, the property was handicapped by limited availability of level ground and a public road running through the camp's grounds. Some evidence suggested that the attractive location of the property along the Delaware River and its ready accessibility to the main arteries leading to major urban centers, made the property attractive for residential and commercial development, especially in view of the active real estate market in the Poconos during the "sixties" and the early "seventies."
 
 
 69
 Two types of camps were operating in Monroe County at the time of the taking: (1) organizational camps sponsored by church groups or other nonprofit associations such as the Girl Scouts, Boy Scouts, and the Young Men's Christian Association, and (2) private camps run by individuals for profit. There was evidence of record to show that in June of 1970 the time of the taking there was a demand for either type of camp on the open market and that eleven specific sales were consummated between 1966 and 1972 in Monroe County, including Camp Wyomissing.
 
 
 70
 I now turn to an assessment of Judge Van Dusen's conclusion that the trial judge erred in his action in this case.
 
 I. THE CHARGE TO THE JURY
 
 71
 The owner of property in every condemnation is entitled to "just compensation" under the fifth amendment. The traditional standard for measuring "just compensation" for private parties is the fair market value of the property condemned. This standard for private parties is often inadequate recompense for the taking of public facilities bridges, roads, schools, or the like because there is no ready market for such facilities. Thus, courts have evolved the substitute facilities doctrine which awards such public condemnees damages sufficient to adequately replace the public facility taken.
 
 
 72
 In 564.54 Acres of Land I we "became the first federal court of appeals to conclude that the cost of substitute facilities could be applied as a measure of just compensation not only to public owners of nonprofit facilities but to private owners of such facilities as well." Note, Cost of Substitute Facilities as a Measure of Just Compensation When There Is a Private Condemnee, 1975 Duke L.J. 1133, 1134. We rejected the contention of the Government that the doctrine could only be applied to a taking of governmental facilities, concluding that "the substitution of facilities measure of fair compensation is available to private owners of nonprofit community facilities." 506 F.2d at 802. Our opinion was vague, however, as to the exact standards to be applied in determining whether the doctrine should be applied to any given case. We stated that in the preliminary stage in which the case was before us we had no occasion to decide whether this was "an appropriate case" to apply the doctrine. Id.
 
 
 73
 Judge Van Dusen concludes that 564.54 Acres of Land I held that the substitute facilities measure of fair compensation is available to private owners of nonprofit facilities "if there is no ready market for the facilities and if the facilities are 'reasonably necessary to public welfare.' " Maj.Op. at 986. (For convenience, Judge Van Dusen's opinion will be cited Maj.Op.)[1] It is apparent from the record that both the Government and the Synod shared in this understanding of our interlocutory opinion and they persuaded the trial court to adopt this as the test for applicability of the doctrine.[2] Although the parties agreed to the applicable test, there was little agreement as to the exact definition of the components used in the standard "ready market" and "reasonably necessary to public welfare." Moreover, nowhere in our prior opinion did we define either of these terms with any specificity.
 
 
 74
 With little guidance from our interlocutory opinion, the trial court faced the difficult task of constructing its charge to the jury based on an agreed upon test with contested definitions as to each of its critical elements. Judges Van Dusen and Stern hold that the instructions eventually fashioned by the district court in its charge inadequately failed to state the law of substitution of facilities, given the gloss asserted by Judge Van Dusen on the ambiguous terms of our interlocutory opinion. I believe that Judges Van Dusen and Stern exceed judicious expectations by demanding that a district judge conform to standards never before enunciated by the appellate court. In view of our implicit mandate in 564.54 Acres of Land I to the district court to apply the substitute facilities doctrine "in appropriate cases" and the failure of any party to object to the charge as given, no error should be found in the jury instructions. Even if some errors may have seeped through, it is not so fundamental as to require reversal, particularly in light of the novel principles enunciated by Judge Van Dusen and the uncertainty of the law in this area.[3]
 
 
 75
 (a) No "Ready Market"
 
 
 76
 At trial there was a serious dispute as to whether the concept of ready market refers to a market in which the facility taken can be sold the Government's contention or whether the concept refers to a market in which a comparable facility can be purchased the Synod's contention. Our interlocutory opinion has language which might support the view of either of the parties, but which also casts some doubt as to whether either party's contention accurately states the law.[4] Judge Van Dusen opts for the Synod's cost of replacement theory, which for purposes of this opinion I shall assume to be correct.
 
 
 77
 Judge Van Dusen states that the requirement that there be no ready market for the condemned facility means that "the owner exercising reasonable diligence, must have been unable to purchase a functionally equivalent replacement at a cost roughly equal to the fair market value of the taken facility." Maj.Op. at 996. He suggests that the instructions given by the trial court on this element of the substitute facilities doctrine were "substantially correct," but because of their confusion on one point, further clarification must now be given. I believe that a close and fair reading of the district court's charge shows that it clearly presents the "ready market" issue to the jury and is also quite favorable to the Synod's position. It is also consistent with Judge Van Dusen's theory of ready market. Furthermore, the Synod's failure to object to the charge is powerfully persuasive that the charge was not confusing.
 
 
 78
 The district court gave four separate instructions on the ready market element. I believe that three of those substantially adhere to the definition of ready market advocated by Judge Van Dusen and that the fourth, even if unclear, was cured by the combination of the three acceptable sections of the charge and by a later cautionary instruction as to the fourth.[5](b) "Reasonably Necessary"
 
 
 79
 As with the element of "ready market," the Synod and Government take divergent views on the meaning of "reasonably necessary to public welfare." The Government construes this term to mean that the facility must at least be reasonably necessary to the community, whereas the Synod interprets the terms as loosely synonymous with beneficial to the community. Judge Van Dusen adopts a variation of the Synod's view, holding that for a facility to be reasonably necessary to public welfare "it must provide a benefit to the community that will not be as fully provided after the facility is taken." Maj.Op. at 995. He concludes that the trial court's charge on this element of the test is "confusing and misleading," as it fails to "accurately reflect (Judge Van Dusen's new) interpretation of the law." Id. I agree with Judge Van Dusen that this part of the court's instructions does include language which supports the Government's reasonable necessity view.[6] But because I believe the test advocated by Judge Van Dusen and accepted by Judge Stern breaks with the requirement of "reasonably necessary" as enunciated by this court in 564.54 Acres of Land I and every other federal court that has spoken on this issue, I disagree with their reversal on this point. The district court's instruction should not be deemed error as it merely states the generally accepted principles of law.
 
 
 80
 At no time did this court in 564.54 Acres of Land I state anything that could be construed as holding that a facility must be merely "beneficial" to qualify for the substitute facilities measure. Moreover, we specifically stated that we preferred the approach of the Second Circuit which "recognizes that the decision to replace a facility may involve discretionary determinations as to community need . . . for a structure reasonably necessary to public welfare . . . ." 564.54 Acres of Land I, supra, 506 F.2d at 800, citing with approval, United States v. Certain Property in Borough of Manhattan, 403 F.2d 800, 804 (2d Cir. 1968) ("The Bathhouse Case" ) (emphasis supplied). A review of principles outlined by the Second Circuit in The Bathhouse Case and its progeny demonstrates conclusively that the requirement of "reasonably necessary to public welfare" has never been given the construction advocated by the majority.
 
 
 81
 Until The Bathhouse Case, supra, the conventional wisdom was that the substitute facilities doctrine was unavailable as a measure of just compensation unless the public condemnee could prove a legal obligation to replace the facilities. Apparently, Judge Stern would prefer that this be the current law as well. However, by the time this case was tried, the Second Circuit specifically rejected this view and held that an obligation to replace a public facility could be found not only by a law compelling the condemnee to do so, but also by a necessity for the public condemnee to reopen the facility brought about by the community's need.[7] The court further stated that even if a structure were reasonably necessary for the public welfare, not all facilities taken need be replaced if the public necessity for the facility no longer exists. The Bathhouse Case, supra, 403 F.2d at 804.
 
 
 82
 Similarly, no other federal court that has spoken on this issue has ever adopted the "beneficial" test; each has limited the application of the substitute facilities doctrine to situations in which the substitution is deemed necessary for the public welfare. See, e. g., United States v. 3,727.91 Acres of Land, 563 F.2d 357, 359-60 n.2 (8th Cir. 1977) (condemnee entitled to substitute facilities measure "if the structure is reasonably necessary for the public welfare"); United States v. Streets, Alleys & Public Ways, 531 F.2d 882, 885 (8th Cir. 1976) ("must furnish only substitute facilities that are reasonably necessary in the circumstances"); Washington v. United States, 214 F.2d 33, 43 (9th Cir.), cert. denied, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954) (application of substitute facilities denied as reasonably adequate substitutes existed). Even as early as 1957, this court stated that the cost of substitute facilities measure could be applied to compensate for the taking of roads so long as the substitute facility would be necessary. See United States v. Certain Lands in Middlesex County, 246 F.2d 823, 824 (3d Cir. 1957).[8]
 
 
 83
 Apparently, the only support for Judge Van Dusen's "benefit" theory is found in law review commentary about our interlocutory opinion. See 1975 Duke L.J., supra ; Note, Substitute Facility Measure of Just Compensation Is Available to Private Owners of Nonprofit Community Facilities in Appropriate Cases, 6 Seton Hall L.Rev. 711 (1975).[9] The Eighth Circuit has already specifically rejected this approach in United States v. Streets, Alleys & Public Ways, supra, 531 F.2d at 886 (condemnees suggested that substitute facilities need only serve a rational governmental purpose, but the court holds that determination to provide substitute facilities turns on whether there is a legal or factual obligation to provide them). The consistent approach of the federal courts is to require that the substitution be reasonably necessary before application of the substitute facilities doctrine. An examination of the district court's charge in this case shows that Chief Judge Sheridan faithfully responded to the interlocutory appeal by stating this generally accepted principle governing the element of reasonable necessity. Moreover, the court's instructions as a whole were totally consistent with the approach of the Second Circuit which we cited with approval in 564.54 Acres of Land I.[10]
 
 
 84
 Judges Van Dusen and Stern reverse because of the failure of the district court to abide by the novel definition of "reasonably necessary" now pronounced by them after the trial of the case. This requires the kind of omniscience that we have no right to exact from a district court. I believe that the district court would have committed error had it charged other than it did the generally accepted principle cited by us in our interlocutory opinion. Judges Van Dusen and Stern may believe their theory is superior to the generally accepted interpretation of the doctrine,[11] but they cannot adopt that novel theory, overrule our prior opinion sub silentio, and hold the district court in fundamental error because it relied on our previous statement of the law. Therefore, I see no error in this part of the charge. I believe my view in this respect is confirmed by Judge Stern who agrees that the Government's argument on reasonable necessity "is justified even compelled" by our interlocutory decision.II. FUNDAMENTAL ERROR
 
 
 85
 Even if some error is seen in the charge to the jury a doubtful proposition in light of the precedents of this court the error must be so fundamental that our failure to reverse would result in a miscarriage of justice. As we previously have alluded, no part of the charge was objected to by the Synod. As Judge Van Dusen notes, the failure to object and state grounds for the objection with specificity, F.R.Civ.P. 51, does not bar relief to a party in an extraordinary case. See Callwood v. Callwood, 233 F.2d 784 (3d Cir. 1956). An examination of the cases cited by him demonstrates, however, that in this case the error could not be deemed so fundamental and prejudicial that we should overturn the district court.
 
 
 86
 The cases cited by Judge Van Dusen as having reversed a trial court because of erroneous jury instructions, either objected to for the first time on appeal or noted by us sua sponte, were based on misstated clear principles of law involving "plain" error. E. g., Ratay v. Lincoln National Life Ins. Co., 378 F.2d 209, 212 (3d Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967) (lower court incorrectly charged jury on burden of proof, "firmly established" that wrong standard used); Wilson v. American Chain & Cable Co., 364 F.2d 558, 562 (3d Cir. 1966) (lower court erred in jury charge on superseding cause in view of settled law); Pritchard v. Liggett & Myers Tobacco Co., 350 F.2d 479 (3d Cir. 1965), cert. denied, 382 U.S. 987, 86 S.Ct. 549, 15 L.Ed.2d 475 (1967) (lower court erred in jury charge on assumption of risk, misstated clear Pennsylvania law); Mazur v. Lipschutz, 327 F.2d 42 (3d Cir. 1964) (lower court erred in trial charge on vicarious liability, failing to charge the Pennsylvania "Captain of Ship" doctrine); Leposki v. Railway Express Agency, Inc., 297 F.2d 849 (3d Cir. 1962) (lower court erred in jury charge of superseding cause, failed to charge clear elements of rules); McNello v. John B. Kelly, Inc., 283 F.2d 96 (3d Cir. 1960) (jury charge on negligence was so general it was equivalent to no charge at all).
 
 
 87
 This case, if seen at its worst, calls for no more than an application of Trent v. Atlantic City Elec. Co., 334 F.2d 847 (3d Cir. 1964), in which we held that a charge which apparently gave inconsistent instructions, could not be deemed fundamental error when read in whole with the rest of the instruction. 334 F.2d at 857; see also Callwood v. Callwood, supra, 233 F.2d at 788. Judge Van Dusen states and Judge Stern agrees that the jury charge on the "reasonably necessary" element of the test was fundamentally erroneous. They find error in the failure of the district court to anticipate an entirely new standard never before articulated in any federal case. Furthermore, they find this error even though the district court did no more than follow the clear test of the Second Circuit approved in our interlocutory opinion. Their holding extends the Ratay/Pritchard/McNello rule far beyond its limited scope of requiring reversal when a court fails to charge according to clearly established principles of law. I therefore cannot discern any fundamental error in this case.
 
 III. GOVERNMENT'S CLOSING REMARKS
 
 88
 There may be some question as to the propriety of the Government's remarks at closing.[12] They may not have fairly characterized the not-for-profit element of the substitute facilities doctrine, indicating that the Synod though operating not-for-monetary profit might have been receiving another kind spiritual profit. The remarks apparently were not impressive for the Synod failed to object to them at the time they were made or even to address them in its rebuttal closing argument. It was not until after the jury retired for the day that the Synod thought of objecting and moved for a mistrial.
 
 
 89
 Judge Van Dusen states that this objection was timely under Shepler v. Crucible Fuel Co., 140 F.2d 371 (3d Cir. 1944), which he says establishes the principle that an objection to closing remarks of counsel is reviewable so long as it is brought to the attention of the trial court in time for the trial court to have "an opportunity to rule on the matter and correct any prejudicial errors." Maj.Op. at 990. Shepler, however, concerns only an evidentiary question and a careful reading of the opinion shows that we adopted the rule of the Eighth Circuit, holding only that objections must be brought at the proper time in order to afford the trial court an opportunity to review the objection. We did not specifically state the proper time for such an objection to be made.[13] A review of the law in the Eighth Circuit reveals that the timeliness for an objection to remarks made in closing argument is measured by the time of the prejudicial remarks. See Sanden v. Mayo Clinic, 495 F.2d 221 (8th Cir. 1974). Under that view, the objection to the Government's remarks here would be untimely and for us to reverse we would have to find fundamental error. See Porterfield v. Burlington Northern Inc., 534 F.2d 142 (9th Cir. 1976), Schleunes v. American Cas. Co., 528 F.2d 634 (5th Cir. 1976); Hyman v. Life Ins. Co. of North America, 481 F.2d 441 (5th Cir. 1973). The remarks of the Government in the instant case rise nowhere near the level of prejudice required for reversal. See Edwards v. Sears Roebuck & Co., 512 F.2d 276 (5th Cir. 1975) (testimony attributed to a witness never made at trial); San Antonio v. Timko, 368 F.2d 983 (2d Cir. 1966) (personal attacks and outrageous argument that if defendants contest the amount of damages they admit liability). Here, it could not be seriously maintained that a reasonable jury at a trial in which not-for-monetary profit was the consistently pressed issue, could be misled by the closing remarks of a zealous Government attorney. This case is similar to Lewis v. Penn Central Co., 459 F.2d 468 (3d Cir. 1972), in which we held that the failure of the complaining party to object when it could have rebutted any negative inference from a closing argument, coupled with the trial court's refusal to award a new trial, should not require reversal on appeal. 459 F.2d at 468.
 
 
 90
 Even if the objection were deemed timely and prejudicial, there was no error committed in the trial court requiring reversal because the district court adequately cured the prejudice of the remarks. Judge Van Dusen notes some of the precautions taken by the trial court to prevent prejudice arising from counsel's remarks, but concludes that they were insufficient to cure the taint. I disagree.
 
 
 91
 The trial court stated clearly that the jury was "to follow the law as stated in the instructions of the Court" and that it would be a violation of the jurors' duty if they based their verdict on "any other view of the law than that given" in the charge. Tr. 788. The court told the jury that their recollection of the facts governed, and that the "statements of counsel are not evidence" but "merely attempts to persuade." Tr. 795-96. The court then specifically charged the jury that they could find the substitute facilities doctrine applicable "if the facilities were operated on a not-for-profit basis, for religious purposes . . . ." (Emphasis supplied.) Even with the Government's questionable comment, the jury was instructed unequivocally to follow the charge and the charge stated clearly that the jury could find not-for-profit, even if there was a religious purpose. Therefore, no reversible error can be found on this point.[14]
 
 IV. CONCLUSION
 
 92
 To recapitulate, I believe that the record in this case establishes:
 
 
 93
 (1) No error may be found in the charge to the jury.
 
 
 94
 (a) The "ready market" element of the jury instruction conformed to the test advocated by Judge Van Dusen and the district court instructed the jury to disregard that part of its instructions which may have been confusing.
 
 
 95
 (b) The district court correctly charged the jury as to "reasonably necessary," following the mandate of 564.54 Acres of Land I and the principles consistently enunciated by the federal courts.
 
 
 96
 (2) Even if any error in the charge were found, it cannot be deemed fundamental inasmuch as the only significant error possibly committed by the district court was its failure to adopt the novel principles now enunciated by Judge Van Dusen and accepted by Judge Stern.
 
 
 97
 (3) No error may be found in the failure of the district court to sustain the objection of the Synod to the Government's closing argument in view of
 
 
 98
 (a) its untimeliness, and
 
 
 99
 (b) the curative instructions given by the district court.
 
 
 100
 I would therefore affirm the judgment of the district court denying the motion for a new trial.[15]
 
 
 
 *
 Honorable Herbert J. Stern, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 The Synod also argues for the first time on appeal that it was error to submit the special interrogatory to the jury because it poses a question of law to be answered by the court. At trial, the Government argued that this question was one for the court, but the Synod did not join this argument nor object when the court ruled that the interrogatory would be submitted to the jury. Apparently, the Synod preferred to have the jury answer this question, but now, having lost, argues that the court should have answered it. Since the Synod did not challenge submission of the question of the applicability of the substitute facilities doctrine to the jury in the district court, we decline to address this contention on appeal. See Kirkendoll, supra at 698; Wyoming Construction Co., supra at 104
 
 
 [2]
 F.R.Civ.P. 51 provides in pertinent part:
 "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."
 
 
 [3]
 This circuit first recognized an exception to F.R.Civ.P. 51, note 2, supra, in Callwood v. Callwood, 233 F.2d 784, 788 (3d Cir. 1956), which stated that the court could review a jury charge not objected to if the error in the charge was fundamental and highly prejudicial. In our frequent application and reaffirmance of this principle, we have stated it a number of different ways. In Ratay v. Lincoln National Life Ins. Co., 378 F.2d 209, 212 (3d Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967), we stated that we would engage in such a review because the erroneous instruction related to a critical issue and it did not affirmatively appear from the whole record that it was not prejudicial. The charge was reviewed in Wilson v. American Chain and Cable Co., 364 F.2d 558, 562 (3d Cir. 1966), because "(t)he jury was without adequate guidance on (a) fundamental question . . . . A verdict so arrived at is one ungoverned by the legal principles which determine the dispute between the parties and therefore may not be sustained as the ultimate product of the judicial process." Pritchard v. Liggett & Meyers Tobacco Co., 350 F.2d 479, 486 (3d Cir. 1965), cert. denied, 386 U.S. 1009, 87 S.Ct. 1350, 18 L.Ed.2d 436 (1967), held that "(w)here it is apparent on the face of the record that a miscarriage of justice may have resulted from counsel's failure to properly protect the interest of his client by timely objection, the error must be noticed and rectified." In Trent v. Atlantic City Electric Co., 334 F.2d 847, 859 (3d Cir. 1964), we stated that "(t)his court has on occasion reversed sua sponte on the basis of plain or fundamental error respecting the charge." In McNello v. John B. Kelly, Inc., 283 F.2d 96, 102 (3d Cir. 1960), we reversed on the basis of instructions not objected to because the instructions were so inadequate that they were "tantamount to no instructions at all." Accord, Mazer v. Lipschutz, 327 F.2d 42, 52 (3d Cir. 1964) ("an appellate court may in its discretion, disregard Rule 51 when the error claimed is plain and may result in a miscarriage of justice . . . ."); Leposki v. Railway Express Agency, Inc., 297 F.2d 849, 850 n.1 (3d Cir. 1962)
 
 
 [4]
 Nothing we have said should be taken to imply that a facility will qualify for the substitute facilities doctrine if it is run on a non-profit basis for other than the purpose of charity or for the purpose of providing a service at a low cost; for example, if it does not make a profit because of mismanagement or inefficient operation or because certain employees are paid high salaries. In the present case, the Synod attempted to show that the potential to make profits was transferred to the community as a community benefit, and our discussion is limited to this factual situation. One rationale for the substitute facilities measure is to indemnify not only the owner of the condemned facilities, but those who have an interest in the continuing existence of the facilities, in this case, according to the Synod, the general public. See United States v. Certain Property in Borough of Manhattan, 403 F.2d 800, 804 (2d Cir. 1968); Note, Cost of Substitute Facilities As A Measure of Just Compensation When There Is A Private Condemnee, 1975 Duke L.J. 1133, 1149. See also 564.54 Acres I at 800: "(T)he owner of a facility devoted to a non-profit, public use has a proprietary as well as a community interest in it . . . ."
 
 
 [5]
 564.54 Acres I suggests that the facilities must be unique for the substitute facilities measure to apply. This is not a separate condition but rather part of the "no ready market" condition
 
 
 [6]
 See also United States v. Certain Land in Borough of Brooklyn, 346 F.2d 690, 694 (2d Cir. 1965):
 " . . . strict application of the market value rule of compensation will often be abandoned when the nature of the property or its uses produce a wide discrepancy between the value of the property to the owner and the price at which it could be sold to anyone else."
 Accord, United States v. Certain Property in Borough of Manhattan, 403 F.2d 800, 802 (2d Cir. 1968).
 
 
 [7]
 To show that reasonable diligence was exercised, it may not be enough for the condemnee to show that no camps were advertised openly during the relevant time period if there is evidence that camps were being bought and sold or that unadvertised camps could have been purchased if inquiry had been made. In attempting to purchase facilities, however, the directors of a charitable or religious organization are not necessarily expected to exercise the skill and business acumen of a profit-motivated businessman. Whether the Synod exercised reasonable diligence is a question of fact to be decided on remand
 
 
 [8]
 It may be possible to purchase functionally equivalent facilities for a cost far in excess of the fair market value of the condemned facilities. For example, the only functionally equivalent camps in the area may be in the path of industrial or residential development, and therefore camping may not be the highest and best use of the property. In this situation, the substitute facilities doctrine is applicable, but if it would cost less to purchase the equivalent camp than to construct a new one, the cost of substitute facilities should be based on the purchase price of this camp if the condemnee could have purchased it exercising reasonable diligence
 
 
 [9]
 As noted above, we do not find fundamental error with the jury instructions on this point; however, the jury instructions were not completely clear in explaining the proper meaning of "no ready market." Although the court correctly told the jury that it must find that there was no ready market for the facilities if the Synod could not replace the camps (N.T. 802) and that "if the fair market value of the condemned property is substantially less than the cost of constructing functionally equivalent substitute facilities, then the substitute facilities doctrine is a proper method of valuation" (N.T. 797), the court also stated that if the jury found that the camps had market value in the usual sense, the substitute facilities doctrine would not apply and the property should be treated like that of any other private condemnee. The court stated:
 "The general rule is that just compensation is to be measured by the fair market value of the interest taken. That is the price which would have been agreed upon in the open market between a willing buyer and a willing seller. Fair market value is the normal and useful standard of just compensation. There are, however, instances where because the property taken either is public property of a state or a municipality or is a rarely transferred specialty, where no market value in the usual sense exists. If you find this is the case in this proceeding, then the substitute doctrine will apply. If you do not find this to be the case, then the property should be treated like that of any other private condemnee." (N.T. 800-01; emphasis supplied.)
 The italicized language is clearly inconsistent with the language of 564.54 Acres I quoted above. The court attempted to correct this error by stating:
 "Members of the jury, at one point in my Charge, I told you as follows: 'There are, however, instances where because the property taken either is a public property of a state or of a municipality or is a rarely transferred specialty no market value in the usual sense exists. If you find that this is the case in this proceeding, then the substitute facility doctrine will apply. If you do not find this to be the case, then the property taken should be treated like that of any other private condemnee.'
 "I will ask you to disregard that and consider my other instruction because the doctrine can apply to something which is not public. But the factors have to be present which I have given you." (N.T. 808-09)
 This curative instruction only cures the error created by the implication in the earlier instruction that the substitute facilities doctrine applies only to public property. It leaves open the inference that the substitute facilities doctrine applies only where there is no market value in the usual sense. Therefore, the jury may have incorrectly thought that, for the substitute facilities doctrine to apply, the facilities must have no market value.
 
 
 [10]
 For example, in California v. United States, supra, the "streets" taken were actually proposed streets 20 feet below water in the San Francisco Bay
 
 
 [11]
 For example, in Woodville v. United States, 152 F.2d 735 (10th Cir. 1946), there was no benefit to be gained by constructing new roads because the entire town the roads served had been taken by condemnation and flooded. Similarly, in United States v. 3,727.91 Acres of Land, supra, the condemnee would have served no purpose by constructing new levees and drainage ditches to control flooding because the Government took the land on which flooding could be controlled. In United States v. Streets, Alleys & Public Ways, Etc., supra, new streets and alleys would have provided no benefit because the population of the town had decreased to 30 under threat of condemnation for a reservoir, and new streets constructed by the condemnor were adequate for that number of people. In Washington v. United States, supra, constructing a substitute road would have served no purpose because some of the communities served by the road were being flooded and a new road constructed by the condemnor adequately served the other communities. In arguing that these cases are inconsistent with the community benefit interpretation of "reasonably necessary" (dissenting opinion, note 8), the dissent fails to distinguish between benefit to a few individuals and benefit to the community. It does not follow from the fact that substitute facilities would have benefited a few people in these cases that substitute facilities would have been sufficiently valuable or important to provide a community benefit. We realize there may be difficulties in defining "community" in some cases, but this case does not present that problem
 
 
 [12]
 See United States v. Streets, Alleys & Public Ways, Etc. and Washington v. United States, both discussed in note 11, supra
 
 
 [13]
 In rejecting the Government's strict interpretation of "necessary," the court stated:
 "(I)t will not at all do to say that in determining the cost of providing any necessary substitutes, an award in condemnation may be denied because there are already in existence other available routes which will in some fashion handle the traffic diverted by the condemnation. . . . In any proper view of the requirements of just compensation, the substitute 'necessary' is that necessary to readjust its street and highway system to serve the municipality's requirements and needs in as adequate a manner and extent and with equal utility as such system would have provided had the facility in question not been condemned, so far as this is reasonable and practical."
 
 
 [14]
 The expression "reasonably necessary" is not commonly used in ordinary language, but rather appears to be an expression framed by the courts. Consequently, it must derive its meaning primarily from the facts of the cases in which it has been applied and the cases from which it developed. However, insofar as it is proper to qualify the word "necessary" with the word "reasonably" in ordinary language, the expression "reasonably necessary" seems somewhat analogous to an expression like "reasonably good," meaning not entirely good but somewhat good. Therefore, in ordinary language, "reasonably necessary" must mean "not entirely necessary, but somewhat necessary" to the welfare of the community. This is roughly equivalent to "beneficial to the community" and is consistent with our analysis of "reasonably necessary" as a legal term of art. Furthermore, as noted above, the facility must be "reasonably necessary to public welfare" and public welfare connotes community benefit. The dissent misinterprets our discussion in this footnote. We do not equate the expression "reasonably necessary" with the expression "reasonably good." We think that because the expression "reasonably necessary" is not commonly used in ordinary parlance, comparing it with a common expression like "reasonably good" helps to clarify its meaning. Of course, as the dissent notes, the words "reasonable" and "necessary" are used in ordinary language every day. The expression "reasonably necessary," however, is not so common to laymen, some of whom are vitally interested in the principle in this case, and, as noted, appears to be an expression framed by the courts
 
 
 [15]
 See Note, Duke L.J., supra note 4 at 1141. The dissent disagrees with this interpretation of the "reasonably necessary" test because "(u)nder the proposed standard, governmental condemnors would be subject to the whims and caprices of private nonprofit swimming clubs, ice-skating clubs, tennis clubs, and myriads of other nonprofit recreational and social organizations who might discern need for their facilities but which the community might find frivolous." Dissenting opinion, note 9. This point is reiterated in the dissenting opinion, note 11. We do not think this result would follow from our decision. It is not the whim of the owner of a nonprofit facility that will determine whether the Government will have to replace the facility. This will be determined by the jury. Under our standard, a trial judge would be free to instruct a jury that it might find that any facility not open to the public does not meet the community benefit or public welfare standard. Therefore, there is no likelihood that the Government would have to replace private clubs under our standard. Secondly, since the jury is the conscience of the community, we must assume that any facility a jury finds beneficial to the community or rationally related to public welfare would not be found "frivolous" by the community. In short, with regard to both private clubs and frivolous facilities, the jury acts as a safeguard on the whims of the owners. There is another reason why we think our broad interpretation of "reasonably necessary" is preferable to the dissent's narrow interpretation. Under the dissent's standard not only would swimming pools, skating rinks, and tennis courts be excluded, but such clearly beneficial and educational facilities as art museums and zoos would also be excluded. Juries might find these facilities to be quite beneficial to the community, yet not reasonably necessary to the community, as many cities have no zoo and no significant art collections. Rather than framing a narrow standard that would jeopardize the continuation of such valuable facilities, we prefer to interpret the "reasonably necessary" standard broadly so that a jury can assure that a valuable community facility is replaced when it has been taken by the Government, whether that facility be as humble as a neighborhood skating rink or as stately as the Philadelphia Museum of Art
 
 
 [16]
 The language of the charge relating to the "reasonably necessary" condition is set out below with emphasis supplied:
 "You may find that the substitute facilities doctrine applies if the facilities were . . . fulfilling a community need or purpose. (N.T. 798)
 "These two valuation doctrines rest upon the theory that if the Synod is under a duty to continue operating the taken facility, it is entitled to sufficient recompense to permit it to continue but if the Synod is not under such a duty, the property should be treated like that of a private condemnee. . . .
 "In determining which doctrine is to apply, the determination rests fundamentally on the existence or nonexistence of the community's need for the property condemned. This will be your first and fundamental question. The duty to replace need not be legally compelled. It may arise from necessity.
 "Therefore, you must decide whether the Synod has shown the condemned facility to be reasonably necessary. You should note the fact that the Synod may have drawn up plans for replacing the appropriate facilities, that the Synod has committed itself to use any award to construct a replacement, or the fact that it acquired a site for a substitute facility; none of these is conclusive evidence that the substitute facility is needed.
 "You should also note that not every condemned facility needs to be replaced. Substitution may be unreasonable or unnecessary. The public need may no longer exist or adequate alternative facilities may be available. (N.T. 801-02)
 "If you find that the Synod has proved a need to replace the condemned camps, the substitute facilities doctrine requires that the Synod be awarded a sum of money which would allow it to replace the camps functionally equivalent to the condemned facilities." (N.T. 803)
 
 
 [17]
 In this formulation of the third condition, we have consciously avoided using the expression "reasonably necessary." Because this expression, not commonly used in ordinary language, could easily be misinterpreted by a jury, we think avoiding it is desirable
 
 
 [1]
 The Supreme Court has stated:
 The guiding principle of just compensation is reimbursement to the owner for the property interest taken. "He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more."
 United States v. Virginia Elec. & Power Co., 365 U.S. 624, 633, 81 S.Ct. 784, 790, 5 L.Ed.2d 838 (1961) (emphasis added).
 Perhaps it is not inappropriate to view the people or the community as the owner of a public facility and thus to seek to indemnify them for the taking of a public facility. But I can see no real sense in which the community can be viewed as the owner of a private, non-profit facility and thus no reason to attempt to indemnify it for the taking.
 
 
 [2]
 564.54 Acres I states, at 799-800 (emphasis added):
 Typical of facilities which simply cannot be valued in the marketplace, or by capitalized earnings, or by depreciated replacement cost, are those erected for common public purposes by states or their public subdivisions; roads for example. Fair indemnification in such circumstances requires compensation sufficient to provide a substitution for the unique facilities so that the functions carried out by or on behalf of members of the community may be continued. Depreciated replacement cost often will not permit continuation of such functions. To meet the requirement of fair indemnification for the taking of community facilities the courts have developed the "substitute facilities" measure of compensation.
 The Second Circuit has approved a deduction for depreciation from the cost of substitute facilities in the very case whose approach the interlocutory opinion "prefers". See United States v. Certain Property in Borough of Manhattan, 403 F.2d 800, 804 (2nd Cir. 1968). The commentators have endorsed a depreciation deduction to avoid the windfall which would otherwise result. See Note, Cost of Substitute Facilities as a Measure of Just Compensation When There is a Private Condemnee, 1975 Duke L.J. 1133, 1145-1146 (1975); Note, The Sovereign's Duty to Compensate for the Appropriation of Public Property, 67 Colum.L.Rev. 1083, 1118-1119 (1967).
 
 
 [1]
 I do not share Judge Van Dusen's confidence that United States v. 564.54 Acres of Land I, 506 F.2d 796 (3d Cir. 1974), laid down an inexorable principle as to when the doctrine should be applied. In my view, we went only so far as holding that the substitute facilities measure might be applied to "private owners of nonprofit community facilities . . . in appropriate cases." Id. at 802 (emphasis supplied). The opinion does, however, contain a discussion of the genesis of the doctrine. Certain language indicates that the substitute facilities measure might be used for compensation in cases in which "neither a fair market value nor a capitalized earnings approach . . . will produce a fair result" roughly a "ready market" requirement. Id. at 799. Similarly, the opinion states that the doctrine has been used as a measure of "fair compensation for a structure reasonably necessary to public welfare." Id. at 800. But, nowhere do we hold that these are in fact the elements of our test. We do, however, cite with approval the approach of the Second Circuit, which in my view encompasses the elements of no "ready market" for the facility and its reasonable necessity to the public welfare. See United States v. Certain Property in Borough of Manhattan, 403 F.2d 800, 803-04 (2d Cir. 1968) (The Bathhouse Case)
 Although the exact standards to be applied were not clearly defined by the interlocutory opinion, I do not intend to imply, as Judge Stern suggests I do, that it was impossible for the district court to apply the appropriate standards. In fact, I specifically assert that Judge Sheridan "faithfully adhered to the principles of law enunciated by us" in the interlocutory opinion.
 
 
 [2]
 See United States v. 564.54 Acres of Land II, D.C.Civ.No. 70-240 (M.D.Pa.) trial transcript (Tr.) at 716 (Synod closing argument), Tr. 742-43, (Government closing argument), Tr. 797-98 (District court's instructions)
 
 
 [3]
 As Judge Van Dusen notes, no party at any time in the district court, during motions for a new trial, or in briefs submitted to this court, ever objected to the jury charge. We have held that we will consider objections to the charge raised after trial or by us sua sponte only if "the error in the charge was fundamental and highly prejudicial, and our failure to consider the error would result in a gross miscarriage of justice." Callwood v. Callwood, 233 F.2d 784, 788 (3d Cir. 1956). I believe the record in this case does not disclose any miscarriage of justice and in part II of this opinion I will demonstrate that error, if any, is only by virtue of a new standard enunciated since the trial by Judge Van Dusen's opinion
 
 
 [4]
 In the interlocutory opinion we discuss the development of the substitute facilities measure of just compensation. We state that there are three types of property which might be taken: (1) facilities with a ready market for which fair market value would be full compensation; (2) profit-making facilities for which market value would not be full compensation but whose taking could be indemnified by present value of capitalized future earnings or some other comparable measurement; and (3) facilities for which neither fair market value, capitalized earnings, nor any other traditional measurement would provide fair compensation. 564.54 Acres of Land I, supra, 506 F.2d at 799. We state that as to facilities that could not be valued in the marketplace, the substitute facilities measure would be used to provide fair compensation. Id. This would appear to support the Government's view of the "ready market" requirement. We also, however, state that even in the comparatively rare cases in which a market value could be established for such property, substitution of facilities might still be available if the market value was insufficient to allow replacement of the condemned facility. Id. at 800. This would appear to support the Synod's position
 It may be that the language supports neither the Synod nor the Government for our statements are also consistent with the approach that the substitute facilities measure is only available if the facility taken is not commonly bought or sold in the marketplace. The Second Circuit, whose approach to substitute facilities has been cited by us with approval, see n.1, supra, applies the doctrine when the "market value test is unworkable because the facilities are not commonly bought and sold in the open market . . . ." The Bathhouse Case, supra, 403 F.2d at 803 (emphasis supplied). Thus, it is quite possible that Judge Van Dusen's acceptance of the Synod's definition of "ready market" misconstrues the meaning of our interlocutory opinion.
 
 
 [5]
 (1) In the first explanation of the ready market element of the substitute facilities doctrine, the district court stated that if
 the nature of the property (taken) or its use produces a wide discrepancy between the value of the property to the Landowner, (and) the price at which it could be sold on the open market; . . . and if the fair market value of the condemned property is substantially less than the cost of constructing functionally equivalent substitute facilities, then the substitute facilities doctrine is a proper method of valuation. (Tr. 797.)
 There can be no doubt that this view states with substantial clarity the ready market definition required by Judge Van Dusen as it allows the jury to find for the condemnee in the event the cost of replacement is more than market value. The italicized language substantially tracks the language of his construction of this element of the test.
 (2) The court also specifically defined "ready market" later in its instruction in a manner totally consistent with Judge Van Dusen's requirements, stating that the jury "must find there was no ready market for (the taken) facilities, if the condemnee could not replace the three condemned camps in the marketplace, within a reasonable time." (Tr. 802.) This is in essence a restatement of the requirement as framed by Judge Van Dusen.
 (3) In another section of its charge, the court instructed the jury that if they found that the camps
 were single-purpose facilities, operated not for profit, and for which there was no ready market, . . . and if . . . the fair market value of the condemned property (was) substantially less than the cost of constructing functional equivalent substitute facilities, (they would be required to) find that the substitute facilities doctrine applie(d). (Tr. 802.)
 In view of the definition of ready market discussed in (2) above, I have serious reservations whether anything in this part of the court's charge could have confused the jury on the element of ready market.
 The district court also told the jury that the "existence or non-existence of fair market value for the condemned facilities may not in and of itself be determinative of any issue in the case." (Tr. 798.) This instruction is cumulative of the others given and lends even greater support to my belief that the district court virtually adopted Judge Van Dusen's view of ready market, a view, the validity of which, I considerably doubt. See n.4, supra.
 (4) Therefore, none of the above instructions may be deemed error. All unambiguously state the definition of ready market articulated by Judge Van Dusen.
 Apparently, it is the fourth instruction given by the district court that may be at odds with the Synod's theory of ready market. In this instruction, the district court stated the general rule that just compensation is to be measured ordinarily by fair market value and that fair market value is defined as the price agreed upon in the open market by a willing seller and a willing buyer. The court further stated that there are instances, such as the sale of a rarely transferred specialty or the sale of public property owned by a state or municipality, in which no market value in the ordinary sense exists. The court then stated that if the jury did not find this to be such a case, "then the property should be treated like that of any other private condemnee."
 On its face, this instruction may be inconsistent to the other three on the concept of ready market. Nonetheless, I believe that the charge, in its totality, is fair to the Synod even with these remarks because it largely is based on the Synod's replacement market approach. Thus, I submit that even in the absence of any remedial action by the trial court to cure the inconsistency in the charge caused by this instruction, no error could be found. In this case, however, the district court cured any possibility of error by instructing the jury to disregard this part of the charge.
 After reading the charge to the jury, the court asked if there were any objections to the charge. Counsel for the Synod stated that he objected to that part of the charge which restricted the "substitute facilities doctrine to a rarely transferred specialty and the public property of a state or municipality." (Tr. 808.) The court sustained the objection and directed the jury to disregard the objectionable instruction and to consider his other instructions "because the doctrine can apply to something which is not public." He concluded by instructing them to consider the other factors which he had given them. (Tr. 808-09.)
 These were the final remarks of the court prior to giving the case to the jury. Any potential problems with the charge as to ready market were cured by this instruction. The remainder of the charge states clearly and accurately the applicable principles of law governing ready market required by Judge Van Dusen.
 
 
 [6]
 Judge Van Dusen characterizes the Government's position on "reasonable necessity" as requiring the facility to be necessary to the community "in a strict sense." Maj.Op. at 992. By this he understands the Government to mean that the facility must be "indispensable." Maj.Op. at 992. This misconstrues the Government's position as they have consistently maintained only that the facility be "reasonably necessary."
 Judge Van Dusen asserts that the expression "reasonably necessary" is difficult to understand; he equates it with "reasonably good" and in turn equates it with "beneficial." Maj.Op. at n.14. These semantic exercises are unwarranted. The words "reasonable" and "necessary" are used by courts and by ordinary citizens every day. Combining the two terms together does not muddle their otherwise clear meaning. The common meaning of the phrase is reflected in Judge Van Dusen's statement that "reasonably necessary" means "not entirely necessary." No further gloss is needed, and if it were, we would have so provided in our interlocutory opinion. We did not then and need not now.
 
 
 [7]
 "When the . . . (public) condemnee proves there is a duty to replace a condemned facility, it is entitled to the cost of constructing a functionally equivalent substitute, whether that cost be more or less than the market value of the facility taken. . . . The duty may be legally compelled or one which arises from necessity . . . . The distinction has little practical significance in public condemnation." The Bathhouse Case, supra, 403 F.2d at 803
 
 
 [8]
 In footnote 11, Maj.Op., Judge Van Dusen attempts to demonstrate that many of the cases which have denied application of the substitute facilities doctrine were, in fact, cases in which no benefit could have been provided by substitute facilities essentially consistent with his test. He contends that even though courts state the test as one of necessity, they use an approach based on benefit. From this Judge Van Dusen reasons that the district court should have charged "benefit" rather than "necessity." Close analysis of these cases shows that they could not have been using the "benefit" test. See, e. g., United States v. Streets, Alleys & Public Ways, 531 F.2d 882 (8th Cir. 1976) (although population was reduced from 130 to 30 people, new roads would have provided a benefit; but the court holds that because other facilities are adequate, no need for substitutes exists); Washington v. United States, 214 F.2d 33 (9th Cir.), cert. denied, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954) (Although few people would travel a substitute road, it would provide a clear benefit to them. The court, therefore, denies applicability of doctrine as substitute unnecessary). Thus, the refusal of a court to apply the substitute facilities doctrine when no benefit results does no more than state the obvious such facilities are unnecessary
 Judge Van Dusen suggests that I fail to distinguish between the benefit to a few and the benefit to the community as a whole. I submit that that is precisely the crux of our difference, for under his view that distinction is difficult if not impossible to make. In this case, for example, is the test whether the camps provide a benefit to the Lutheran community, the community of camping age youngsters, the Philadelphia community, or the community of the state of Pennsylvania? In putting the test in terms of benefit that definition is critical. Under my view, that is why courts have adopted the reasonable necessity test which by its own terms frames the key question is there a need to replace the facility?
 
 
 [9]
 Both the Duke note and the Seton Hall note are based on suggestions made by a commentator in Note, Just Compensation and the Public Condemnee, 75 Yale L.J. 1053 (1966), that when a governmental body decides facilities are necessary to the public welfare, its views are entitled to judicial deference and must be respected unless shown to be irrational. The notes both recommend acceptance of this standard of deference for decisions also made by private landholders as to public need for their property
 I believe that this standard is questionable even with a governmental body charged with administrative responsibility for the operations of government, including provision of public facilities for the community. In the private context, it is unthinkable.
 Under the proposed standard, governmental condemnors would be subject to the whims and caprices of private nonprofit swimming clubs, ice-skating clubs, tennis clubs, and myriads of other nonprofit recreational and social organizations who might discern a need for their facilities but which the community might find frivolous. There may well be a plausible argument for deference to public officials' exercise of discretionary determinations of their communities' need to replace a condemned public facility. In a situation involving a private landowner, however, such deference to his opinion of need is wholly unwarranted because of his self-interest and lack of authority to speak for the community. The jury is the appropriate body to decide whether the public needs replacement of a facility owned by a private condemnee.
 Judge Van Dusen asserts that my fears are overdrawn and a jury will not allow substitution of facilities in the situations I pose. He asserts that the trial court may instruct the jury to disregard the "benefit" test if the benefit to be gained is only by a narrow segment of the community. I believe, however, that under his test the only burden on the condemnee is to prove that his facility provides a benefit to the community which will be reduced after the taking. I stand by my conclusion that this would encompass almost any facility in a community regardless of how many or how few individuals could use the facility. As to Judge Van Dusen's fear that a "reasonable necessity" test may prevent the substitution of facilities for an art museum or zoo, I need only state that facilities of this sort have never been a problem under the traditional test.
 
 
 [10]
 The district court's charge on the element of "reasonably necessary" was stated fairly and favorably for the Synod, encompassing the following:
 (I)f the condemned facilities provide a reasonably necessary service to the community or the facilities are reasonably necessary for the public's welfare . . . then the substitute facilities doctrine is a proper method of valuation. (Tr. 797.)
 You may find that the substitute facilities doctrine applies if the facilities (were) . . . fulfilling a community need or purpose. In determining whether or not the condemned facilities provided a reasonably necessary service to the community, you may consider that the camps were owned and operated by the Lutheran Church, and that the furthering of the Church's religious mission may itself constitute a service to the community. (Tr. 798.)
 These two valuation doctrines rest upon the theory that if the Synod is under a duty to continue operating the taken facility, it is entitled to sufficient recompense to permit it to continue but if the Synod is not under such a duty, the property should be treated like that of a private condemnee. Each doctrine involves the application of different rules of law.
 In determining which doctrine (fair market value or substitute facilities) is to apply, the determination rests fundamentally on the existence or non-existence of the community's need for the property condemned. This will be your first and fundamental question. The duty to replace need not be legally compelled. It may arise from necessity. (Compare this to The Bathhouse Case, supra, 403 F.2d at 803, see n.7, supra. ("The duty may be legally compelled or one which arises from necessity. . . ."))
 You should also note that not every condemned facility needs to be replaced. Substitution may be unreasonable or unnecessary. The public need may no longer exist or adequate alternative facilities may be available. (Compare this to The Bathhouse Case, supra, 403 F.2d at 804. ("This is not to say that every facility need be replaced. . . . Substitution may be unreasonable or unnecessary; the public need may no longer exist or adequate alternative facilities may be available.")) (Tr. 801-02.)
 If you find that the Synod have proved a need to replace the condemned camps, (then they should receive a sufficient award to replace the facilities).
 
 
 [11]
 Although I do not specifically question the validity of Judge Van Dusen's holding that "reasonably necessary" means that "the facility (taken) must have provided benefits to the community that will not be as fully provided after the facility is taken," Maj.Op. at 996. I believe substantial problems may ensue from adoption of this test. Is it to be the rule of this court that the owners of a not-for-profit privately owned tennis facility which cannot be replaced in the marketplace, taken by the federal government, are entitled to an amount sufficient to replace their facility? Will every condemned private non-profit club now be entitled to substitution of facilities? Under the majority test, so long as a benefit to the community is reduced by the taking, they would be so entitled, regardless of the need for the replacement. I believe that this alone points to the unwarranted extension of the doctrine by the majority and compels me to dissent
 
 
 [12]
 These remarks are noted at pages 988-989 of Judge Van Dusen's opinion. In essence, the Government admitted that the Synod operated not for monetary profit, but suggested that they gained a spiritual profit by possibly converting campers to the Lutheran faith. The Government argues now that their closing remarks were proper because they were relevant as to the element of reasonable necessity, bringing into focus the issue of whether the camp was providing a public benefit or whether it was being operated for the benefit solely of the Synod. I believe that this line of argument is permissible, but may encounter first amendment problems at some point. It is unnecessary in this opinion, however, to closely define the boundary of permissible comment on the necessity of church-sponsored activity, especially in view of the court's instruction that "the furthering of the Church's religious mission may itself constitute a service to the community." (Tr. 798.)
 
 
 [13]
 In Shepler v. Crucible Fuel Co., 140 F.2d 371 (3d Cir. 1944), we stated that
 "The law requires that errors to be reviewable, must have been definitely and timely called to the attention of the trial court, in order to afford that court a fair opportunity to pass upon the matter, and correct its own errors, if any. The purpose is to require counsel, at the proper time, to call the attention of the court to the claimed error . . . ." Arkansas Bridge Co. v. Kelley-Atkinson Const. Co., 8 Cir., 282 F. 802, 804.
 140 F.2d at 374 (emphasis supplied).
 
 
 [14]
 Judge Van Dusen suggests that the failure of the court to specifically state that the Government's remarks should have been ignored requires reversal. The district court, however, faced with a motion for a mistrial might very well have concluded that the Synod would be better protected without restating the remarks. In any event, the court explicitly stated that the jury could find for the Synod even if the properties were operated for a religious purpose
 
 
 [15]
 I do not discuss the Synod's other appellate contentions specifically, because I dissent. I note, however, that I believe them without merit. After carefully reviewing the record, I also believe that substantial evidence supports the jury's verdict denying application of the substitute facilities doctrine. Judge Muir, who heard the motion for a new trial, also concluded that substantial evidence supported the jury's verdict and that there was sufficient evidence to support at least a finding that the camps were "not reasonably necessary to the community."