UNITED STATES of America, Appellee,

v.

3,727.91 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF PIKE, STATE OF MISSOURI.

Appeal of ELSBERRY DRAINAGE DISTRICT, Appellant.

No. 76–1772.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1977.

Decided Sept. 30, 1977.

---

Edward A. Glenn, argued, Glenn & Smith, Louisiana, Mo., on brief, for appellant.

Larry A. Boggs, Atty., Dept. of Land & Natural Resources, U. S. Dept. of Justice, argued, Peter R. Taft, Asst. Atty. Gen., and Edmund B. Clark, Washington, D. C., on brief, for appellee.

Before LAY and BRIGHT, Circuit Judges, and MILLER, Judge.*

LAY, Circuit Judge.

The Elsberry Drainage District is the fee simple titleholder of a narrow, irregularly shaped strip of land consisting of approximately 214 acres of levees and ditches. In 1917 and 1918 the District had constructed extensive levees and drainage ditches on the land to control periodic flooding of adjacent property. In 1971 the United States condemned the land to establish a waterfowl refuge area. After a plenary trial, the district court awarded the Drainage District $1.00. The Drainage District has appealed contending that the award is not just compensation.

The Drainage District urges the trial court erred in its application of the substitute facilities doctrine and its finding that the levees were fully depreciated. We reverse and remand the case for further proceedings before the district court.

■ The Drainage District presented no evidence that it would be required to replace the levees and ditches taken by the United States.[1] The district court therefore found that substitute levees and drainage ditches were not required to replace those taken by the United States. The

Drainage District does not contest this ruling on appeal.[2]

The district court ruled, however, that if no substitute facilities were required only nominal compensation was permissible. The court reasoned:

> The District has not shown that substitute levees and ditches will be required in order that the District might fulfill its function of protecting the lands remaining within the District. . . . As in the context of street condemnation, the District has been relieved of its burden of maintaining the levees and ditches. The Court is unable to distinguish this condemnation from the condemnation of streets and accordingly, absent a showing of the need for substitute facilities, only nominal damages may be awarded.

We find the court erred in applying this rule to the present facts.

■ In the cases cited by the district court the public condemnee has held only a right of way easement in a public street or alley, and, upon condemnation, they retained no interest in the property. Under these circumstances only nominal compensation is held to be proper. *See United States v. Streets, Alleys and Public Ways in Village of Stoutsville, Missouri*, 531 F.2d 882, 887 (8th Cir. 1976); *United States v. City of New York*, 168 F.2d 387, 389–90 (2d Cir. 1948); *Woodville, Oklahoma v. United States*, 152 F.2d 735, 736–37 (10th Cir. 1946), *cert. denied*, 328 U.S. 842, 66 S.Ct. 1021, 90 L.Ed. 1617 (1946). This same reasoning does not apply, however, where the public body continues to own a fee interest in the condemned land. Under these circumstances the fact that the substitute fa-

---

* The Honorable Jack R. Miller, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. The evidence in fact indicates that the Drainage District sought and obtained permission to have the area within the proposed wildlife refuge excluded from its responsibility and to relieve it from the obligation of maintaining the

levees and ditches in those areas taken by the government.

2. Under the substitute facility doctrine if the structure is reasonably necessary for the public welfare, then the public condemnee is entitled to the cost of constructing a functionally equivalent substitute. However, the key to the application of this doctrine is whether the facility need be replaced. *See United States v. Certain*

cilities doctrine is not applicable does not in itself compel an award of only nominal compensation. *See California v. United States*, 395 F.2d 261, 263 (9th Cir. 1968).[3]

■■■ The goal of compensation in a condemnation case is indemnification. *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473–74, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973); *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); *Seaboard Air Line Ry. v. United States*, 261 U.S. 299, 304, 43 S.Ct. 354, 67 L.Ed. 664 (1923). The substitute facilities doctrine is not an exception to the fair market value test but merely an alternative means of determining what just compensation is when a public facility is involved. As the Ninth Circuit observed in *California v. United States, supra* :

> Whatever standard is used, the equitable principles underlying just compensation require that *any* profitable uses of the lands which are left open by the dedication [to the public use involved] *must* be considered in determining the

fact of loss and in calculating its monetary equivalent.

*Id.* at 267 (emphasis added).

*See also United States v. Certain Property in Borough of Manhattan*, 403 F.2d 800, 803 (2d Cir. 1968); *California v. United States, supra* at 266.

### Alternative Methods of Valuation.

Alternatively the district court ruled that only nominal compensation was proper under any other method of valuation. The court noted that a fair market value had not been established for the land and that therefore a reproduction cost less depreciation measure could be used to arrive at an award. Finding the ditches and levees to be fully depreciated, the court awarded only nominal compensation.[4]

Application of reproduction cost less depreciation is highly questionable in the context of this case. This method has typically been used in the valuation of buildings and equipment.[5] The cases cited by the trial court in support of the use of the reproduc-

---

*Property in Borough of Manhattan*, 403 F.2d 800, 803–04 (2d Cir. 1968).

**3.** In *United States v. City of Jacksonville, Arkansas*, 257 F.2d 330 (8th Cir. 1958), this court noted:

> It is here argued that the proper measure of damages for the taking of municipally owned easements is nominal damages in the absence of the necessity to substitute, and that the court erred in not so holding, in admitting evidence, and in instructing the jury on any other theory. It is true that where a substitute must be acquired or furnished for the property taken the amount of just compensation is usually the amount of the cost thereof. We have so held where a public highway was condemned which had to be replaced by acquiring and constructing a new highway in its place. In the instant case no substitute or duplicate will be required and we have held in *United States v. State of Arkansas*, 8 Cir., 164 F.2d 943, 944:
>
> > "The fundamental principle is that the public authority charged with furnishing and maintaining the public way, whether it be a highway, a street, or a bridge, must be awarded the 'actual money loss which will be occasioned by the condemnation * * *.' This amount is usually the cost of furnishing and constructing substitute roads."

This is a far cry from holding that the cost of the substitute road is the only measure of damages under all circumstances. As said by us in *United States v. State of Arkansas*, supra, *the amount awarded must be the "actual money loss which will be occasioned by the condemnation ".*

*Id.* at 333 (emphasis added).

*See also* 4A Nichols' The Law of Eminent Domain, § 15.2[1], at 15–26 (3d ed. 1976).

**4.** The trial court's finding that the levees and ditches were fully depreciated, although challenged on appeal, is supported by substantial evidence and is not clearly erroneous.

**5.** Nichols states:

> Where a *building* is a specialty, and, in a sense, unique, being constructed for a special use, the valuation cannot be predicated on the same basis as a *building* constructed for general or usual . . . use. In the case of a specialty there is a limited market and the customary testimony of market price is not available. It has been held under such circumstances that reproduction cost . . . may be considered.

4 Nichols, *supra* § 12.32[3][b], at 12–377 (emphasis added).

tion cost formula all involve either buildings or equipment.

■ Here the facilities are not to be replaced. We think the true issue is the value of the Drainage District's land, albeit with old, fully depreciated levees and ditches on the land. In *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 70 S.Ct. 217, 94 L.Ed. 195 (1949), the Court noted in dictum that "reproduction cost, when no one would think of reproducing the property," is a false standard. *Id.* at 403, 70 S.Ct. at 222. *See also United States v. Buhler*, 305 F.2d 319, 327 (5th Cir. 1962); *United States v. Benning Housing Corp.*, 276 F.2d 248, 250 (5th Cir. 1960). We need not decide the case on this basis, however. We deem the use of the reproduction cost formula inappropriate here for another, more obvious reason.

■ The basic measure of compensation in a condemnation case is the property's fair market value. Only when fair market value cannot be determined or would provide inadequate compensation are other measures of value appropriate. *See United States v. Toronto, Hamilton & Buffalo Navigation Co., supra*, 338 U.S. at 402, 70 S.Ct. 217. *See also* 4 Nichols' The Law of Eminent Domain § 12.1 (3d ed. 1976). We find in the present record that there was sufficient evidence for the court to make an award based on the property's fair market value.

■ The Drainage District argues on appeal that the trial court improperly rejected evidence of the fair market value of its land in making the court's determination that fair market value could not be ascertained. The Drainage District had offered evidence of what it asserted was a prior sale of its land. The sale relied upon by the Drainage District involved the purchase of tracts of land from private parties. The tracts, purchased for a specific amount per acre, included agricultural land, timber, and, inadvertently, some of the levees and ditches

owned by the Drainage District.[6] There was no division of the price between the various types of land. The Drainage District claimed that the price paid for the land purchased reflected the value of its land. The district court's findings of fact stated the Drainage District's proposed formula as follows:

[T]he District looked to the sales between the government and the various landowners, which, prior to the August 1, 1975 order of this Court, were thought to incorporate the lands involved herein. The District divided the total amount of acreage in each sale into the total purchase price to arrive at a price per acre, and then multiplied that price by the amount of acreage in each sale which was, in fact, owned by the District. After making adjustments for increased land values, the District produced a valuation of $104,378.16.

The trial court, however, determined that the formula was "too speculative . . . to be a reliable indicator of market value." There is no proof in the record that the government would have paid the average acreage price for the levees and ditches by themselves. Under the circumstances we cannot say that the trial court erred in rejecting the evidence.

Three government appraisers also testified as to the land's value. M. T. Chandler testified that the land was worth $11,700 basing his opinion on a comparable sale involving the Missouri Conservation Commission and his own experience. Thomas Follrath related that, based on an examination of records in the county, talks with people in the area, viewing the property in question, an examination of other sales in the area and his own experience and knowledge as a real estate appraiser, he believed that the fair market value of the land was $10,700. Follrath also indicated that the Missouri Conservation Commission sale was the only comparable sale. The third government appraiser assigned only a nominal value to the land.

6. Following the purchase, the Drainage District sought and received a declaratory judgment that the land belonged to it.

■ In assessing the government's valuation testimony, the district court found the Missouri Conservation Commission sale only an effort by the sellers to rid themselves of a "marginally viable business." Since a willing buyer and a willing seller are usually assumed when comparable sales are introduced as evidence of the value of similar property, we think the court properly rejected the use of this sale as proof of value of the Drainage District's land. *See* 4 Nichols, *supra* § 12.3113[1], at 12–140.

■ Comparable sales are not, however, a prerequisite to crediting an appraiser's valuation of property. In addition to an appraiser's general skill and knowledge, he or she must "be acquainted with values in the vicinity of the land in controversy, and he must be familiar with the property itself, or at least have examined it . .," 5 Nichols, *supra* § 18.42, at 18–160. The appraiser's competence is not dependent upon knowledge of comparable sales. *Id.* § 18.42[1], at 18–187. Thus, the lack of a comparable sale affects only the weight of the appraiser's testimony as the district court quite properly concluded.

■ The district court ruled that without the comparable sale as evidence of value the appraisers did not have an adequate basis for their valuation. As the trial judge acknowledged in his finding of fact, at least one appraiser, Follrath, had engaged in the type of thorough inquiry into the status of the property which would have allowed him to give an opinion on the property's value with *or without* the use of any comparable sales. In light of the underlying policy in condemnation proceedings of providing the "full monetary equivalent of the property taken," *Almota Farmers Elevator & Warehouse Co. v. United States, supra,* 409 U.S. at 473, 93 S.Ct. at 794, we think Follrath's testimony deserved to be given greater weight.

Although the Drainage District challenged Follrath's assessment of the value of its property, the District did not contend that his valuation was too high. Therefore, with the exception of the imprecise testimony of one government appraiser, the evidence introduced at trial established a minimum value for the land at $10,700.

■ An appellate court will not ordinarily disturb a trial court's condemnation award unless the award is "grossly inadequate or excessive." *See* 5 Nichols, *supra* § 17.1[4], at 17–12. *See also United States v. 1,162.65 Acres of Land,* 498 F.2d 1298, 1301 (8th Cir. 1974). We may, however, set aside the trial court's award where "the amount of the award is not supported by any evidence and is, in fact, contrary to the evidence adduced at trial. . . ." 5 Nichols, *supra* § 17.1[4], at 17–17. *See also United States ex rel. Tennessee Valley Authority v. T. Industries, Inc.,* 489 F.2d 921, 925 (6th Cir. 1974).

■ Under the circumstances we conclude that the trial court's award was inadequate and not supported by the evidence. The case is therefore reversed and remanded for reconsideration of the award of damages.