UNITED STATES of America, Plaintiff, Appellee,

v.

125.07 ACRES OF LAND, MORE OR LESS, SITUATE IN the TOWNS OF TRURO AND WELLFLEET, COUNTY OF BARNSTABLE, COMMONWEALTH OF MASSACHUSETTS, Thomas W. Rich, et al., Defendants, Appellants.

No. 81–1160.

United States Court of Appeals, First Circuit.

Argued Sept. 15, 1981.
Decided Dec. 31, 1981.

Marshall D. Stein, Boston, Mass., with whom Hale, Sanderson, Byrnes & Morton, Boston, Mass., was on brief, for appellant.

Joseph J. McGovern, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, VAN DUSEN, Senior Circuit Judge,* BOWNES, Circuit Judge.

VAN DUSEN, Senior Circuit Judge.

This is an appeal from a final judgment of the district court, entered January 16, 1981, awarding the appellant landowners $39,800.00 as compensation for lands condemned by the United States for the expansion of the Cape Cod National Seashore Project (hereinafter "Seashore").[1] The district court based its award on the report of a three-member commission appointed under Fed.R.Civ.P. 71A(h) to take testimony and view the property. On appeal, the landowners urge that the court erred in adopting the report of the commission because its award was outside the range of expert testimony and because certain deductions made by the commission for road

---

* Of the Third Circuit, sitting by designation.

1. *See* 75 Stat. 284, 16 U.S.C. § 459b (1976). This enabling legislation specifically empowers the Secretary of the Interior to acquire land within the Seashore boundaries by condemna-tion. *Id.* § 459b-1(a). There is no dispute in this case that the taking is for a public purpose and is, in all other respects, proper. The sole issue is the adequacy of the compensation awarded by the district court.

improvement costs are not chargeable to the landowners as a matter of state law. This court has jurisdiction under 28 U.S.C. § 1291 (1976).

Because we believe that important issues of state law, peculiarly local in nature, were not fully considered by the district court and because the resolution of those issues may reflect upon the adequacy of the commission's instructions and analysis, we will vacate the judgment of the district court and remand for further proceedings not inconsistent with this opinion.

## I.

The tract of land at issue here, denominated No. 25T–5723, was described by the commission as follows:

"The subject tract is located in the Town of Truro on an ancient way known as Pond Road. It is approximately 2850 feet easterly of Old County Road, a paved way, and approximately 4130 feet from Route 6, a State Highway running through Truro. The tract has an area of 9.3 acres. It has a frontage on Pond Road of 1380 feet, its northern boundary. It has a depth on the West of 225 feet; on the East 390 feet; and on the South 1330 feet. The tract is fairly level, with the exception of its easterly portion which is affected by a kettle-hole, so called, which has a maximum depth of about 20 feet. The tract is wooded, with a growth of scrub oak and pine, which is characteristic of the area.

"Access to the subject tract from Old Colony Road [sic],[2] the nearest paved road, is by way of dirt and/or sand road, called Lombard Valley Road for a distance of some 460 feet to Pond Road, and thence along Pond Road for some 2390

feet to the northwesterly corner of the property. As noted heretofore, there is also access from Route 6, lying to the East of the property, but it is more than 4130 feet from the subject tract. Pond Road is presently approximately 10 feet wide and is composed of dirt and sand."

Report of Commissioners, at 1–2.[3]

At the trial before the commissioners, the landowners' engineer testified that, in his opinion, the property could be subdivided into eight residential lots. He also testified that 10 lots could be created with Planning Board approval and described the condition of Pond Road and Lombard Valley Road. An appraiser testified for the landowners that the highest and best use of the property was for a residential subdivision and that, at that use, the tract had a gross value of $76,260.00. This figure was based upon an analysis of four "comparable sales" with adjustments for time, topography, access, and the like. From the gross value, this appraiser deducted $3,896.00 for the cost of bringing utilities to the property and $2,000.00 for the cost of minor improvements to Lombard Valley Road.[4] This left a net, or fair market, value opinion of $70,064.00 which he rounded to $70,000.00.

An engineer called by the Government testified that his study of the property indicated that the best use of the tract would be for "assemblage"—that is, that it be held for future residential development in conjunction with adjoining land. The principal basis for this conclusion was the witness' belief, based upon his experience in such matters, that Pond Road provided inadequate access for the landowners' proposed subdivision and that, whatever Pond Road is called, its legal status is not such that the

---

2. In context, it is clear that the commission is referring here to "Old County Road," not "Old Colony Road."

3. The bulk of the background facts, the description of the subject property and the expertise of the witnesses (with certain limited exceptions which will be noted where relevant) are not in dispute. The background information discussed in this opinion is gleaned from the record as a whole and from the Senate Report on the Cape Cod National Seashore Act.

See S.Rep.No.87–428, 87th Cong., 1st Sess. (1961), reprinted in [1961] U.S.Code Cong. & Ad.News 2212.

4. The issue of road improvement costs will be discussed at length in part III of this opinion. It should be noted at this point, however, that the questions of who must bear those costs, their amount, and to which roads they are attributable are in considerable dispute.

town, rather than the landowners, is responsible for its maintenance. An appraiser called by the Government essentially corroborated the testimony of the engineer. He testified that, in his opinion, the highest and best use of the property was for assemblage and that it had a gross value for that purpose of $50,589.00 based upon comparable sales. Applying a 50% discount factor to account for the fact that the tract is "backland," as well as for the costs of assemblage and development, road improvements, and utilities, he concluded that the fair market value of the tract under this use would be $25,300.00.[5]

To test this hypothesis, the Government appraiser also priced out a subdivision of two oversized home lots. This use yielded a gross value of $76,300.00, road and utility costs of $58,300.00, and a net fair market value of $18,000.00. Based upon this result, the appraiser reaffirmed his conviction that the highest and best use of the tract would be for assemblage. Upon questioning by the commission, he further opined that, assuming that the legal status of Pond Road is such that Planning Board approval would not be required, a 10-lot subdivision would yield a gross value of $118,000.00 but a net value of only $34,155.00, adjusted for time, in light of substantial road improvement and utility costs.

As can readily be seen, substantial portions of the testimony before the commission concerned the physical condition and legal status of Pond Road. The physical condition of the road itself and the expense involved in putting it in a condition where the lots along it would be salable, while hotly disputed by the parties, are essentially questions of fact as to which the commission, having heard the witnesses and viewed the property, is entitled to deference. The legal status of the road, on the other hand, is of great importance in determining whether and to what extent the various proposed subdivisions would require Planning Board approval and, crucial to this appeal, whether the Town of Truro or the developer-landowner must bear the cost of improving and maintaining the road.

Through their engineer, the landowners offered into evidence, over the Government's relevancy objection, an order of the district court, Garrity, J., in a related case, *United States v. Certain Parcels of Land in Barnstable County, Etc.,* No. 74–182–G (D.Mass. Aug. 15, 1980) (hereinafter "Garrity decision"). The pleadings, affidavits, and memoranda of law in that case were made a part of the appendix in this appeal.[6] In his order, Judge Garrity directed the commission in that case to appraise the tract based upon the fact that "Tract 25T–5724 bounds for the full length of its southerly side by a public road [7] hereinafter called Pond Road ... with a width of three (3) rods, or 49.5 feet." Slip op. at 1–2. The landowners argued at the trial before the commission that the effect of this decision is to declare Pond Road to be a "public way" for purposes of section 81L of the Massachusetts Subdivision Control Law,[8] so

5. He further testified that the tract would have a fair market value for assemblage of $34,-000.00 if the Town of Truro is responsible for the maintenance of Pond Road.

6. The exact issue which was before Judge Garrity in No. 74–182–G is not clear. From all appearances, the Government was there trying to argue that tract 25T–5724, which lies across Pond Road directly to the north of this tract, was essentially landlocked and that the commission should be so instructed. The landowners took the position that they, and the public, had a right of access over Pond Road. The various memoranda of law, however, discuss other issues in addition to this one.

7. While Judge Garrity's written order declares Pond Road to be a "public road," his earlier bench opinion refers to it as a "public way." The Government asserts that the difference is more than mere semantics.

8. *See* Mass.Gen.Laws Ann. ch. 41, § 81L (West 1979). Section 81L provides in pertinent part:
"'Subdivision' shall mean the division of a tract of land into two or more lots and shall include resubdivision, and, when appropriate to the context, shall relate to the process of subdivision or the land or territory subdivided; provided, however, that the division of a tract of land into two or more lots shall not be deemed to constitute a subdivision within the meaning of the subdivision control law if, at the time when it is made, every lot within the tract so divided has frontage on (a) a public way or a way which the clerk of the

that no Planning Board approval would be required for either the two-lot subdivision proposed as an alternative use by the Government or for the eight-lot plan proposed by the landowners.[9]

The Government's witness, on the other hand, testified that, in his opinion,[10] the term "public road" as used by Judge Garrity was equivalent to the historical term "proprietor's road," but that neither of these terms constituted a "public way" within the meaning of the Subdivision Control Law.[11]

In its report in this case, the commission recited the land description and comparable sales testimony at length and then concluded:

"We find that the highest and best use of the subject tract is for residential purposes. In our opinion the tract can be appropriately subdivided into two or more homesites, with a maximum number of eight (8) without Planning Board approval. We find that Pond Road provides legal access to the subject tract, with a width of 49.5 feet as determined by the

United States District Court on August 15, 1980. At the same time the Court determined Pond Road to be a public road.

"On the issue of fair market value, we have carefully considered the comparable sales offered in evidence by both parties. We have viewed most of these properties on several occasions, and are in a position to appreciate their comparability to the subject tract and the necessity for adjustments for time, location, configuration, view, topography and like elements. In this case it has been urged upon us that we should depart from what might be termed 'a pattern of consistency.' (These are our words-not counsel's). It is true, as a reading of our reports to the Court will show, that we have uniformly valued wooded lots or tracts at $6,000 per acre, ($6,500 if one or two acres), where the access is over unimproved dirt or sand roads. A study and analysis of the comparable sales in this case only serve to confirm our opinion as to value. What we are dealing with here is a parcel of

city or town certifies is maintained and used as a public way, or (b) a way shown on a plan theretofore approved and endorsed in accordance with the subdivision control law, or (c) a way in existence when the subdivision control law became effective in the city or town in which the land lies, having, in the opinion of the planning board, sufficient width, suitable grades and adequate construction to provide for the needs of vehicular traffic in relation to the proposed use of the land abutting thereon or served thereby, and for the installation of municipal services to serve such land and the buildings erected or to be erected thereon."
Id.

9. Otherwise, because the two-lot plan, and at least arguably the eight-lot plan, would leave each lot with the minimum frontage and lot size required by the applicable zoning ordinance, the projects would apparently come under § 81L(c) of the Subdivision Control Law so that the Planning Board could require that the road be improved to the point of "suitable access." See note 8 supra.

10. On several occasions during trial, witnesses for both parties were asked for, or otherwise offered, their "opinions" as to the proper interpretation of Judge Garrity's order and the proper interpretation and practical effect of the Subdivision Control Law. On most of these

occasions the opposing party made a timely objection on the ground that the issues were pure questions of law and were, in any event, beyond the expertise of the witnesses. The commission, quite properly we think, recognized the validity of the objections but nonetheless received the testimony so that the record would have the benefit of the witnesses' knowledge of the history and application of the law. We too consider the testimony as evidence of the history and common understanding of the law but not insofar as it represents a legal conclusion. While the commission's instructions might have been unclear on this point, see note 21 infra, we point out that any issues concerning the legal status of the road and the effect that that status may have for purposes of the Subdivision Control Law, the right of public access, or the liability of the town for improvement costs are questions for the court and not for the commission. See Fed.R.Civ.P. 71A(h) ("[T]he issue of compensation shall be determined by a commission.... Trial of all issues shall otherwise be by the court.").

11. Before Judge Garrity, the landowners specifically argued that a "Proprietor's Road" is a "Public Road" or a "Public Way" but they did not make specific reference to the Subdivision Control Law.

raw, unimproved land, 9.3 acres in area. It has a frontage of 1380 feet on a rough, dirt and sand road, which, whatever its legal width, on the ground is eight (8) to ten (10) feet wide. It is 2850 feet or more than half a mile from a paved road, it is surrounded by similar parcels of land.

"We find that the subject tract has ·a value of $6,000 per acre, or a total value of $55,800. From this figure must be deducted the cost of bringing utilities to the site and improving the road to make it reasonably safe and serviceable for the residences that would be constructed in the proposed subdivision. The defendants urge that these costs should be divided among the landowners in the immediate area, who would benefit by the introduction of utilities and the improvement of the road. In the absence of any evidence from any landowner or landowners in the area as to whether they would be willing to share in such costs or as to when they might seek to develop their property, we find the proposed allocation too speculative and conjectural to consider in connection with these findings. We find the cost of bringing utilities to the subject tract would be $3.50 per linear foot, or a total sum of $14,000 for the 4000 feet involved. We also find that the cost of improving the road to provide adequate access for the homesites for the proposed subdivision would be $2,000. This results in total costs of $16,000 which should be deducted from the total value of $55,800. Making this calculation, we find the fair market value of the subject tract to be the sum of $39,800." Report of Commissioners, at 4–5.

The landowners filed timely exceptions to the commission report alleging, *inter alia*, that the award was outside the range of · expert testimony, that the report was conclusory, that the commission relied on improper "arbitrary formulas," and that the utility and road cost deductions were improper because "[t]here were two comparable sales on unimproved dirt roads which lacked utilities," and the award here was less per acre than the award in the comparable sales.[12]

In a brief judgment, the district court dismissed the landowners' objections as being "without legal merit;" confirmed, approved, and adopted the commission report "as the findings and conclusions of this Court;" entered judgment for the landowners in the amount of $39,800.00; and ordered that title to the property would vest in the United States upon satisfaction of the judgment "by deposit of the award into the Registry of the Court."

This appeal followed.

## II.

■ While the evidence presented in a condemnation case is often conflicting and confusing, the basic rules of law are refreshingly clear. To begin with, "[t]he only

---

12. As will be discussed in part III of this opinion, one of the landowners' principal contentions in this appeal is that *any* deduction for road improvement costs is improper because Pond Road is a "public road," making the town and not the landowners responsible for its maintenance and repair. We are constrained to note at this point, however, that it is not clear to us that this issue was explicitly raised below. Our reading of the transcript of the commission trial clearly shows that the principal discussion there was over whether Pond Road was a "public way" for purposes of the Subdivision Control Law. The landowners argue that the issue was raised implicitly by the introduction of the Garrity decision. Apparently, their argument is that the decision itself somehow subsumes all of the legal arguments that led up to it and that, since the mainte-

nance and repair argument was made in the memorandum of law submitted to Judge Garrity, as it clearly was, the mere introduction of the final order in this case is sufficient to raise the issue here. We frankly view this reasoning as somewhat strained.

On the other hand, an expansive reading of the landowners' exception No. 4 to the commission report could be said to raise the issue although the language is not at all clear.

While we generally look with disfavor upon arguments such as these which we must struggle to ferret out of the record below, the importance that this issue may have in this and other Seashore cases compels us to entertain the landowners' argument despite the sketchy record. *See* C. Wright, *Law of Federal Courts* § 104, at 523 (3d ed. 1976).

absolute standard is that provided by the Constitution—'just compensation'—and the only sure guide in a difficult condemnation case is the consideration 'What compensation is "just" both to the owner whose property is taken and to the public that must pay the bill?'" *United States v. 320.0 Acres of Land, More or Less, Etc.*, 605 F.2d 762, 781 (5th Cir. 1979), *quoting United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950).[13] The issue then becomes the fair market value of the property—the amount a willing buyer would pay a willing seller at the time of taking. *United States v. 320.0 Acres of Land, More or Less, Etc., supra*, 605 F.2d at 781. Further, as the court explained in *320.0 Acres*,

"... since a hypothetical, 'reasonable man' buyer will purchase land with an eye to not only its existing use but to other potential uses as well, fair market value takes into consideration '[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future * * * to the full extent that the prospect of demand for such use affects the market value while the property is privately held.' *Olson v. United States, supra*, 292 U.S. [246] at 255, 54 S.Ct. [704] at 708 [78 L.Ed. 1236]. Thus, 'just compensation' is not limited to the value of the property as presently used, but includes any additional market value it may command because of the prospects for developing it to the 'highest and best use' for which it is suitable."

*Id.*

▇▇ Thus, the factfinder is presented with multiple sets of conflicting value estimates: first, the hypothetical value of the property when developed to and sold at its highest and best use (the "gross value"); second, the costs of developing the land from its present state to the highest and best use (the "development costs"); and, third, the present fair market value of the

tract, determined by subtracting the development costs from the gross value. From all of this evidence, and from a view of the property, the factfinder—in this case the commission—is required to make a finding of just compensation. The commission having done so, and the district court having adopted it, the scope of review in this court is limited. As the court in *United States v. 9.20 Acres of Land, More or Less*, 638 F.2d 1123 (8th Cir. 1981), has succinctly and cogently stated the rule:

"If the condemnation commission distinctly marks the path it follows in making a specific compensation award, and if the district court adopts the commission's report, the court of appeals must determine whether the report, as adopted by the district court, is 'clearly erroneous.' ...

"In addition, the 'scope of the evidence' rule is applied in condemnation cases. 'The rule is that an award of just compensation will not be disturbed if it is within the scope of the evidence. Generally, *this rule can be simply applied by determining whether the award falls within the extremes of the adverse parties' opinion testimony.*' *United States v. 1,162.65 Acres of Land*, 498 F.2d 1298, 1301 n.5 (8th Cir. 1974). However, a factfinder's compensation verdict which is outside the range of *the experts' ultimate value opinions* for the property may also be upheld where the verdict is supported by other evidence. *Id.* at 1301 and n.5. *See also United States v. 38.60 Acres of Land*, 625 F.2d 196, 201, 201 n.9 (8th Cir. 1980) (scope of the evidence rule defined)."

638 F.2d at 1126 (citations omitted) (emphasis added). *See also United States v. Iriarte*, 166 F.2d 800, 805 (1st Cir.), *cert. denied*, 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 (1948).

▇▇ We believe that a fair reading of the case law compels the common sense interpretation of this rule to mean that the relevant figures are the experts' "ultimate value opinions"—that is, the "net" or fair

**13.** *See* U.S.Const. amend. V ("... nor shall private property be taken for public use, without just compensation").

market value of the property. What is of fundamental importance is whether *the award*—the "just compensation" required by the Fifth Amendment—is within the range of expert opinion or is otherwise supported by the evidence. In this case, the "ultimate value opinions" range from $18,-000.00, for a two-lot subdivision testified to by the Government's appraiser, to $70,-000.00, for an eight-lot subdivision testified to by the landowners' appraiser. The commission found the fair market value to be $39,800.00. This figure is clearly within the range of the experts' "ultimate value opinions."

The landowners disagree with this analysis. In their brief, they focus exclusively on the gross value figures and appear to argue that each element of the award—presumably the "gross," "development costs," and "net" values—must be within its respective range of testimony in order for the ultimate award to be valid.[14] Here, the commission's gross award was lower than the gross award figures offered by the experts.[15] We are not persuaded that this requirement of each of these values being within the range of testimony is the law and none of the cases cited by the landowners support a contrary result.

Two of the cases relied upon by the landowners are clearly inapposite because, in each of the cases, there was only one value opinion in evidence and thus no "range" at all. *See Gregory v. Town of Pageland*, 374 F.2d 490 (4th Cir. 1967); *United States v. 685.2 Acres of Land*, 146 F.2d 998 (7th Cir. 1945). Another case, *United States v.*

*3,727.91 Acres of Land*, 563 F.2d 357 (8th Cir. 1977), is likewise unsupportive. In that case, there were three *net value opinions* in evidence and the award was less than any of them. *Id.* at 362. Finally, *United States v. Hilliard*, 412 F.2d 174 (8th Cir. 1969), was a partial taking case and thus is distinguishable both factually and legally. Clearly, in a partial taking case, both the "before taking" and "after taking" values are critical to the damage award determination. They are truly "elements" or "components" of the award because the ultimate dollar award in a partial taking case has no significance other than as the difference between the before and after taking values. In a complete taking, however, there is really just a single issue: the fair market value of the tract at the time of taking and the dollar award has critical independent significance as the fair market value of the tract, while the gross and development cost opinions simply serve to enable the reviewing court to discern how the ultimate opinion was reached.

In their reply brief, the landowners make a further argument. There they maintain that the net value opinions of the Government's appraiser are somehow "mooted" once the commission arrives at its development cost figure.[16] The landowners cite no authority in support of this argument, nor has our research disclosed any. Further, the proposition again strikes us as contrary to the flexible and common sense approach mandated by the cases. As we have stated, the overriding issue here is fair market

14. This position is discernable from the purported quote from 5 J. Sackman, *Nichols on Eminent Domain* § 17.1[4], at 17–20 to 17–23 (3d ed. 1980), and from the landowners' presentation at oral argument. At oral argument, counsel for the landowners recognized that the *Nichols* passage, relied upon at page 11 of their brief, is a misquotation but maintained that other portions of that treatise support their position. Because we conclude that their analysis is unsupported by the case law, we need not pursue the question further.

15. The Government argues that the gross award *is* within the range of testimony if the Government's evidence as to assemblage is

considered. The landowners argue that the commission rejected assemblage as the highest and best use of the property so that this figure is irrelevant. We note only that the commission report is not clear either way and that, because of our resolution of the principal issue in the previous paragraph of the text, we need not reach this question.

16. "First, the government's figures were net totals from which development costs, such as road improvements and utilities, had already been deducted. But the amount of these deductions were not in the amount which the commission deducted."

value.[17]  In this case, the landowners' expert testified that the tract would yield $76,260.00 at its highest and best use and would require only $5,894.00 in improvements to achieve that use.  The Government's appraiser essentially agreed as to the gross value for this use ($76,300.00) but clearly believed that the achievement of that use would be time-taking and expensive.[18]  Obviously, the commission believed that the tract was less like the comparables than the landowners claimed but more like them than the Government argued.  They chose to express their conclusion through, if you will, a more realistic gross value estimate rather than through more finely tuned development costs.  This seems to us to to be a perfectly reasonable and proper approach and an example of why the landowners' theory that the gross, cost, and net figures must all be within their respective ranges of testimony is artificial, often impractical, and not essential.[19]

**17.**  Whether a witness, or the factfinder, arrives at a fair market value determination by hypothecating a relatively high gross value and then deducting the correspondingly high development costs needed to attain it or by adopting a more conservative gross value estimate and lower development costs is, it seems to us, a matter of differing approaches to the ultimate fact of fair market value.

It should be noted, however, that this presumes that the various values and costs included in the calculation are factually based and legally relevant.  As will be discussed below, the issue of whether a particular cost is legally chargeable to the landowner in arriving at fair market value is generally a question of law for the court which should be resolved before the commission receives its instructions.

**18.**  Reading between the lines, the landowners' appraiser believed that the tract was very close to the comparables while the Government appraiser believed that it could be made to sell for about what the comparables brought, but only after costly improvements.  Aside from the pure legal issue of who must pay those costs, this is nothing more than a disagreement on a question of fact—the comparability of the subject tract to the "comparable sales."

**19.**  Because of our resolution of this issue, it is unnecessary for us to address the question of whether the commission's award, if outside the range of testimony, is otherwise supported by the evidence.  We make, however, some observations for the guidance of the district courts in future cases.

At the outset, we reemphasize our belief that the case law dictates that the courts, and the commissions they appoint, take a flexible and practical approach to the evidence.  This is especially true in this case, where the vast scope of the Seashore project—including hundreds of similar takings and, apparently, nearly two-thirds of the Town of Truro where this particular property is located—means that arm's length sales of the most truly comparable tracts—those adjoining the subject—are not available.  Thus, the valuation process becomes even more hypothetical and subjective than it would normally be.  Therefore, it is not unreasonable to expect that, in an ongoing series of condemnations of this magnitude, the commission will weigh the evidence and opinions presented in light of the evidence they have heard and the awards they have made in other Seashore cases.  So long as those other cases remain a basis for comparison and do not become the principal support for the award, they would appear to be a suitable and proper part of the analysis.  In fact, the Supreme Court in *United States v. Merz*, 376 U.S. 192, 197, 84 S.Ct. 639, 642, 11 L.Ed.2d 629 (1964), made clear that the use of a commission is justified in part by the "likelihood that uniformity of awards may be realized expeditiously."  Had the commission here weighed the evidence, concluded that the gross value of the tract was $55,800.00, and *then* opined that it felt secure in its decision because its award compared favorably with the results reached in other cases, we would have little hesitancy in commending its approach.

What concerns us, however, is what we perceive to be a desire on the part of the commission to look to the other cases *first* and then to consider the evidence in the case at hand in order to determine whether the award should be more or less.  We would view such an approach most critically in light of the *Merz* Court's admonition that "there is danger that commissioners, unlike juries, may use their own expertise and not act as a deliberative body applying constitutional standards."  *Id.*  Uniformity of results, although desirable, is at most a secondary concern.  The chief considerations in each case must be just compensation and due process.  The district courts should instruct the commissions under their supervision that, while comparisons to other cases and to matters within their personal knowledge may have a helpful place in complex condemnation cases such as these, their award determination must be made on a case-by-case basis, without the use of arbitrary formulas, and their report must provide a reviewing court with a clear indication of the evidence in the record upon which their award is based and a similar indication of "what path [they] took through the maze of conflicting evidence."  *Id.*

We conclude, therefore, that while the commission report was not a model of specificity, the commission award was clearly within the range of the testimony presented. Consequently, unless the presentation and analysis of that testimony is irremediably flawed with an error or errors of law, the district court's judgment should be affirmed. It is to this issue that we now turn.

### III.

■ While we adhere to our view that the principal concern in a condemnation case is the commission's fair market value opinion, that is by no means the end of the analysis. To the contrary, it cannot be clearer that "[t]he first responsibility of the District Court, apart from the selection of responsible commissioners, is careful instruction of them on the law." *United States v. Merz, supra,* 376 U.S. at 198, 84 S.Ct. at 643. Manifestly, if the commission is given an erroneous instruction, or no instruction at all, on a question of law which may have an impact upon their determination of fair market value, their decision is tainted in the same manner as a jury verdict returned upon an erroneous instruction. The legal status of Pond Road is just such a question.

■ As we intimated earlier, this issue goes far beyond the question of whether the commission's deduction of $2,000.00 for improvements to Pond Road must be set aside.[20] Rather, the status of Pond Road, both as to the Subdivision Control Law and the responsibility to maintain, is of necessity a critical element in formulating a value opinion for the tract. The transcript of the commission hearing makes clear that the principal opinions of the experts were based upon differing assumptions concerning these issues. Further, when one side would press the other's witness for an opinion based upon a different assumption, the witness would seek to avoid answering and, when pressed further, would render an opinion but then discount it as a rough guess. Thus, it is possible that, while the commission's award is within the range of testimony presented, that "range" may be unreliable—not because the Government's net figure is based upon development costs other than those found by the commission, but because it may be based upon a faulty legal premise either as to the power of the Planning Board or the burden of maintenance. Clearly, the "high" end of the range could be unreliable for similar reasons.

The problem that this presents on appeal is obvious and underscores the need to raise and litigate these sorts of issues *before* the commission receives its instructions. It was just such a procedure which led to Judge Garrity's order and which should have been employed here. The commission was provided with a set of 26 detailed instructions covering nearly 40 pages. Instruction No. 22 lists the public roads in Truro.[21] Included in this list is a "Pond Road." At the very outset of the commission hearing, how-

at 198, 84 S.Ct. at 643. *See also Government of the Virgin Islands v. 2.6912 Acres of Land,* 396 F.2d 3, 5 (3d Cir. 1968); 7 J. Moore, *Federal Practice* ¶ 71A.90 [9.–1] (3d ed. 1980). *Cf. United States v. 564.54 Acres of Land,* 441 U.S. 506, 516, 99 S.Ct. 1854, 1859, 60 L.Ed.2d 435 (1979) (referring to the "Court's continuing efforts to develop relatively objective valuation standards").

20. In its brief and at oral argument, the Government maintained that the road cost deduction made by the commissioners was attributable to Lombard Valley Road rather than Pond Road. The landowners acknowledged that the record is at best confusing on this point.

The court has considered appellants' letters of September 25, 1981, and October 19, 1981, and appellee's letter of October 15, 1981, all sent after the oral argument. It is now clear that the $2,000.00 for improvements related to Pond Road and not Lombard Valley Road. However, appellants have not shown that there existed in the district court record in this case proof of a final district court judgment in the litigation concerning Tract 25T–5722, approving the September 1981 Commissioner's Report forwarded with appellants' September 25, 1981, letter or establishing that the Town of Truro or any government body is responsible for the upkeep of Pond Road.

21. This instruction is illustrative of the problems here for two reasons. First, it is entitled "Public *Roads* in Truro," but the first paragraph reads: "The following is a listing of public *ways* ...." The parties have gone to a great deal of time and trouble before the commission and in this court in arguing whether

ever, counsel for the landowners acknowledged that the "Pond Road" mentioned in the instructions is not the "Pond Road" at issue here and then sought to argue the collateral estoppel effect of Judge Garrity's decision.[22] We are at a loss to understand why counsel, who obviously had discovered this discrepancy in preparing their case, did not go to the district court and seek to have the instruction clarified, the effect of Judge Garrity's decision determined, and the subdivision and maintenance issues resolved.

In a civil jury trial, "[n]o party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires ...." Fed.R.Civ.P. 51. *See* 5A J. Moore, *supra*, ¶ 51.03. There is no analogous language in Rule 71A(h) or in Rule 53 to which Rule 71A refers. Nonetheless, the Supreme Court has made clear that "the litigants have a responsibility to assist the process by specifying their objections to instructions, by offering alternate ones, and by making their timely objections to the reports in specific, rather than in generalized form ...." *United States v. Merz, supra*, 376 U.S. at 199, 84 S.Ct. at 643.

Because these issues are likely to recur in these Seashore cases and because their reso-

lution would impose a degree of order and certainty in these proceedings, we are convinced that they should be addressed in this case. While we hesitate to prolong this case any further, we are equally convinced that the record before us is insufficient for a proper resolution of such highly technical and peculiarly local questions of state law, none of which has been fully briefed or argued, to our knowledge, either here or in the district court.[23] Therefore, we will remand the case for a full consideration of these issues, and, in doing so, we will try to illustrate the problems which we see lurking in this record.

To begin with, the district court must determine precisely what the issues before Judge Garrity were and which, if any, of them he actually decided. We suspect, but do not decide, that the landowners may be correct in their assertion that that decision may have some collateral estoppel effect here, at least insofar as it decided that the "Pond Road" at issue here is the "Pond Road" laid out by the Town of Truro in 1714–15. *Cf. Bruszewski v. United States*, 181 F.2d 419 (3d Cir. 1950); Restatement of Judgments §§ 68, 73 & 75 (1942). The

"public road" is synonymous with "public way" and, if so, for what purposes. Just looking at the face of the instruction should have put the parties on notice that the issue would arise and have prompted them to seek clarification of the instruction from the district court.

Second, the instruction concludes:

"This is not to suggest that there are not additional public ways, and in the process of determining fair market value of certain parcels, you will be called upon to determine the character and nature of roads, ways and access avenues."

If this language is interpreted to mean that the commission must resolve questions concerning the legal status, as contrasted with the physical condition, of such roads, then we believe it to be inconsistent with the clear language of Rule 71A(h). *See* note 10 *supra*.

**22.** Counsel for the landowners stated:

"MR. HALLISEY: I will state for the record, it's my duty to do so, that the Pond Road mentioned in the instructions to the Commissioners is not the same Pond Road. However, we are maintaining that the Pond Road that passes locus is the very same Pond Road referred to in Judge Garrity's order."

During subsequent discussions of comparable sales, it becomes apparent that the "Pond Road" referred to in the instructions may actually be the road known as "Old Long Pond Road."

**23.** To be precise, aside from the "opinions" of the parties' engineers and appraisers, the only focused legal argument that we have on these issues is the collection of the pleadings and memoranda which were before Judge Garrity. There is also some discussion of them in a letter brief from the Government, received after oral argument, in response to a similar letter from counsel for the landowners. There is also a subsequent letter brief from the landowners, in reply to the Government's letter, maintaining that the Government's arguments are not properly before us. As previously noted, we read this exchange of letters as establishing that the road cost deductions made by the commission in this case were attributable to Pond Road, rather than Lombard Valley Road. *See* note 20 *supra*. In light of our remand, however, we find it unnecessary to consider the legal arguments contained in such letter briefs or the preliminary issue of whether those arguments are properly before us.

much more important question, though, is just what this determination means and, as to that, the questions abound.

Before Judge Garrity, the Government appeared to concede that the document at issue there "constitutes a 'formal layout' of a public way" but argued that that "way" was not "Pond Road." Judge Garrity disagreed. If that is true, and the Government is bound by it, the question then becomes whether that "public way" is the same sort of "public way" referred to in the Subdivision Control Law [24] and whether it is synonymous with the term "town way" for purposes of section 1 of chapter 84, which makes towns responsible for the maintenance of "highways and town ways." [25] If not, does it constitute what is now called a "statutory private way" which is laid out by the town [26] and in which the public may over time gain a right of access, but for whose maintenance the town is not responsible? [27] Further, if the town is responsible to maintain the roads "so that they may be reasonably safe and convenient for travelers," [28] does that require improvement necessary for a subdivision or simply maintenance at the level of use existing or reasonably anticipated when the road was laid out?

■ While the age of these roads and various rules of law applicable to them at different times make these questions difficult, the law nevertheless seems clear that "[w]hen the fact of a public way is disputed, the burden of proof falls on the party asserting the fact." *Witteveld v. City of Haverhill*, —— Mass.App. ——, ——, 421 N.E.2d 783, 785 (1981), *citing Commonwealth v. Hayden*, 354 Mass. 727, 728, 242 N.E.2d 431 (1968). This is so because to hold the town responsible for the maintenance of a road is also to hold it liable for negligence in performing, or failing to perform, that maintenance. *Loriol v. Keene*, 343 Mass. 358, 361, 179 N:E.2d 223, 225 (1961). Although the cases do not speak to this precise issue, reading these cases and

**24.** *See* note 8 *supra.*

**25.** *See* Mass.Gen.Laws Ann. ch. 84, § 1 (West 1958). Section 1 provides in pertinent part:
"§ 1. Repair of highways and town ways at expense of towns
Highways and town ways, including railroad crossings at grade with such highways and town ways, shall be kept in repair at the expense of the town in which they are situated, so that they may be reasonably safe and convenient for travelers, with their horses, teams, vehicles and carriages at all seasons. A city or town shall submit a letter of request for such repair and for approval by the state department of public works. Upon receipt of such approval, the city or town shall be reimbursed by the commonwealth from monies which may be appropriated therefor by the commonwealth and the federal government to defray expenses of such repairs for safety programming. Such reimbursement will not create liability, of any kind, either civil or criminal on the part of the commonwealth or the federal government."
*Id.*

**26.** Mass.Gen.Laws Ann. ch. 82, § 21 (West 1958). Section 21 provides:
"§ 21. Authority to lay out ways. The selection or road commissioners of a town or city council of a city may lay out, relocate or alter town ways, for the use of the town or city, and private ways for the use of one or more of the inhabitants thereof; or they may order specific repairs to be made upon such ways; and a town, at a meeting, or the city council of a city, may discontinue a town way or a private way."
*Id.*

**27.** *See* Mass.Gen.Laws Ann. ch. 40, § 6N (West 1958). Section 6N provides:
"§ 6N. Private ways; temporary repairs, ordinances or by-laws
Cities and towns may by ordinance or by-law provide for making temporary repairs on private ways. Such ordinance or by-law shall determine (a) the type and extent of repairs; (b) if drainage shall be included; (c) if the repairs are required by public necessity; (d) the number of percentage of abutters who must petition for such repairs; (e) if betterment charges shall be assessed; (f) the liability limit of the city or town on account of damages caused by such repairs; (g) if the ways shall have been opened to public use for a term of years; and (h) if a cash deposit shall be required for said repairs."
*Id.* This section, when read in conjunction with section 21 of chapter 82, set out in note 26 *supra*, clearly indicates that there may be ways, laid out by the town and used by the public, which the town nevertheless need maintain only at its option.

**28.** *See* Mass.Gen.Laws Ann. ch. 84, § 1 (West 1958), *reprinted at* note 25 *supra.*

the relevant statutes together would seem to indicate that the same burden applies in determining the issue of whether a road is "public" for maintenance purposes and whether it is "public" for purposes of the Subdivision Control Law.[29]

The recent case of *Fenn v. Town of Middleborough*, 7 Mass.App. 80, 386 N.E.2d 740 (1979), appears to state the rule clearly:

"In general, it may be said that an existing way in a city or town in this Commonwealth is not a 'public' way— that is, one which a city or town has a duty to maintain free from defects (see G.L. c. 84, §§ 1, 15, 22; *First National Bank of Woburn v. Woburn*, 192 Mass. 220, 222–223, 78 N.E. 307 [1906])—unless it has become public in character in one of three ways: (1) a laying out by public authority in the manner prescribed by statute (see G.L. c. 82 §§ 1–32); (2) prescription; and (3) prior to 1846, a dedication by the owner to public use, permanent and unequivocal (see *Longley v. Worcester*, 304 Mass. [580] at 587–589, 24 N.E.2d 533; *Uliasz v. Gillette*, 357 Mass. at 104, 256 N.E.2d 290), coupled with an express or implied acceptance by the public. Because the 1846 statute put an end to the creation thereafter of public ways by dedication and acceptance (*Loriol v. Keene*, 343 Mass. 358, 361, 179 N.E.2d 223 [1961]), it has only been possible since that time to create a public way by a laying out in the statutory manner or by prescription."

*Id.* at 83–84, 386 N.E.2d at 742. Consequently, it is for the district court to determine upon remand whether Pond Road qualifies as a public way under any one of these three tests. The burden is on the landowners either to show that this issue was decided by Judge Garrity or to litigate it *de novo*. Once this issue is resolved, the court must determine whether the town's maintenance obligation, if it exists, pre-

cludes the assessment of any road costs against an abutting landowner. Finally, the court must determine whether, regardless of its status for maintenance purposes, Pond Road is a public way for purposes of the Subdivision Control Law.

IV.

For the foregoing reasons, the judgment of the district court will be vacated and the case remanded for further proceedings not inconsistent with this opinion.

We leave it to the informed discretion of the district court whether, after having resolved these issues of law, it should resubmit the issue of compensation to the commission or "itself resolve the dispute on the existing records, or on those records as supplemented by further evidence." *United States v. Merz, supra*, 376 U.S. at 200, 84 S.Ct. at 644.

The parties will bear their own costs.

**29.** This is so because the purpose of the Subdivision Control Law is to ensure safe and adequate access to all homesites. *See* Mass.Gen. Laws Ann. ch. 41, § 81M (West 1958). Obviously, the two most straightforward ways to ensure this are to require the developer to install or improve an adequate road as a condi-

tion of subdivision approval or to find that the town is responsible for doing it. Under this analysis, it might well be that "public way" as used in the Subdivision Control Law is synonymous with "town way" under the maintenance provision. However, we do not decide the issue on this record.